## Forster, Appellant, *v.* Manchester.

Argued November 21, 1962. Before BELL, C. J., MUSMANNO, COHEN, EAGEN and O'BRIEN, JJ.

*Sheldon L. Albert,* with him *James E. Beasley,* and *Beasley & Ornsteen,* for appellants.

*Ralph P. Higgins,* with him *Harper, George, Buchanan and Driver,* for appellee.

OPINION BY MR. JUSTICE COHEN, March 19, 1963:

The main issues in this case are whether appellee's conduct constitutes an unwarranted invasion of privacy or, alternatively, whether appellee intentionally inflicted severe emotional distress under §46 of the Restatement of Torts.

On July 30, 1960, plaintiff-appellant, Isobel Forster, was involved in an automobile accident with one Francis Martin. Counsel for appellant notified Martin's insurance carrier, the Guardian Mutual Insurance Company (Guardian), and the Hays Adjustment Bureau (Hays), an independent adjustment bureau retained by Guardian, of his representation of Mrs. Forster. With the knowledge of Guardian, Hays retained defendant-appellee, Michael Manchester, a licensed private detective, to make an "activity report" on appel-

lant. An "activity report" is an investigation of the subject's daily activities used to ascertain the extent to which the subject has freedom of movement over his limbs. Appellee conducted the surveillance by assigning a team of two men equipped with motion picture cameras to report on the every-day activities and movements of the subject.

The first day that appellee's investigators were observed by appellant was September 15. On that day, from 8:00 a.m. until 5:30 p.m., appellee's investigators conducted a surveillance of the vicinity where appellant resided. When appellant went out in her automobile, they observed her whereabouts by following her in separate cars, keeping in touch with each other by two-way radio. The purpose of this particular assignment was to make a log of the places where appellant stopped. Appellee's investigator Smith[1] testified that he normally stayed at least a block behind appellant's car, as he stated, at "what I thought would be a safe distance [so] that she wouldn't observe me." During the course of the day Smith occasionally lost sight of appellant's car in traffic. At one time, after appellant disappeared from Smith's view, she suddenly emerged from traffic and passed by him at a distance of no more than ten or fifteen feet. At that time appellant noticed a camera in Smith's hand.[2] A short while later in the same day, Smith had difficulty following appellant's small Volkswagon in traffic and before he realized it his car was almost alongside of appellant's automobile. Recognizing Smith as the man with the camera, she became frightened and attempted to evade him in traffic. Once again during the course of the

---

[1] Smith was a retired police lieutenant with twenty years of service on the police force.

[2] Appellee testified that about ten feet of film was taken that day. There is no evidence in the record as to who viewed these films.

day's surveillance appellant's car passed Smith's automobile, thereby frightening appellant. As a result of being followed by appellee's investigators, appellant became extremely nervous and upset, causing her to have frequent nightmares and hallucinations which required medical treatment.

Appellant advised her attorney about the September 15th incident and gave him the license number of Smith's vehicle. Appellant's attorney contacted Guardian and Hays to determine whether they were responsible for having appellant surveilled. They denied any knowledge of such conduct. Appellant's attorney then contacted appellee who admitted that he was conducting the surveillance but refused to reveal the identity of his client, stating that the investigation was being performed for a legitimate purpose and that the identity of his client was a privileged communication. At this time, appellant's attorney sent a letter to Manchester informing him that his client was suffering "grievous mental pain and suffering" as a result of being followed. He also informed Manchester that the conduct of Manchester's investigators constituted a violation of appellant's right of privacy. Manchester ignored this letter since, as he later testified, he had seen so many exaggerated claims in the past that he "took it with a grain of salt." The surveillances continued, and appellant was aware of being followed on four separate occasions prior to the commencement of this action.

In her complaint in equity appellant prayed for an injunction against further surveillances and for money damages. After hearing testimony the court below entered a decree denying appellant's claim. An appeal was then taken to this Court.

Preliminarily, it should be noted that the issues involved in this case are so interrelated that much of what is said with respect to the right of privacy is

also applicable to the intentional infliction of emotional distress. Judicial recognition of a cause of action for the unwarranted invasion of one's right of privacy is of comparatively recent vintage. In an exhaustive opinion by Judge WOODSIDE the judicial development of the tort is traced. See *Aguino v. Bulletin Company,* 190 Pa. Superior Ct. 528, 154 A. 2d 422 (1959).[3] Although the lines and contours of the tort are not yet sharply defined, perhaps the best definition of the action is given in section 867 of the Restatement of Torts where the rule is stated as follows: "A person who *unreasonably* and seriously interferes with *another's interest in not having his affairs known to others* or his likeness exhibited to the public is liable to the other." (Emphasis supplied). It is therefore necessary for us to determine the extent of the interest to be protected and the reasonableness of appellee's conduct.

In determining the extent of the interest to be protected, we must take cognizance of the fact that appellant has made a claim for personal injuries.[4] Although the so-called "public figure"[5] limitation upon the right to privacy has generally been applied to such persons as actors, public officials, and other newsworthy persons, its rationale also applies to a person who makes a claim for personal injuries. It is not uncommon for defendants in accident cases to employ investigators to check on the validity of claims against them. Thus, by making a claim for personal injuries appellant must

---

[3] For a general summary see McClelland, The Right of Privacy in Pennsylvania, 28 Pa. B.A.Q. 279 (1957); Feinberg, Recent Developments in the Law of Privacy, 48 Colum. L. Rev. 713 (1948); Nizer, The Right of Privacy: A Half Century's Development, 39 Mich. L. Rev. 526 (1941).

[4] Although a complaint was not yet filed, appellant had retained counsel who in turn notified the insurance company of her claim.

[5] See *Hull v. The Curtis Publishing Company,* 182 Pa. Superior Ct. 86, 90, 125 A. 2d 644, 650 (1956).

expect reasonable inquiry and investigation to be made of her claim and to this extent her interest in privacy is circumscribed. It should also be noted that all of the surveillances took place in the open on public thoroughfares where appellant's activities could be observed by passers-by. To this extent appellant has exposed herself to public observation and therefore is not entitled to the same degree of privacy that she would enjoy within the confines of her own home.

Moving to the question of whether appellee's conduct is reasonable, we feel that there is much social utility to be gained from these investigations. It is in the best interests of society that valid claims be ascertained and fabricated claims be exposed.[6] The legislature recognized the importance of these investigative activities in The Private Detective Act of 1953 when it defined the business of a licensed private detective to include investigations of the "identity, habits, conduct, movements, whereabouts . . . of any person" and, in another subsection when it authorized the "securing of evidence to be used . . . in the trial of civil . . . cases."[7] Certainly, following the subject during her daily activities and recording on film her movements and whereabouts is consonant with the wording of the Act and the aforementioned social purpose.

There was nothing unreasonable in the manner in which appellant was followed nor in the taking of motion pictures. In regard to the surveillance, it was conducted by experienced investigators who did not use improper techniques. Investigator Smith testified that he tried to stay at least a block behind appellant in his automobile. The few times on September 15 when

---

[6] We are referring to the general policy behind these investigations and not to the validity of appellant's particular claim.

[7] Act of August 21, 1953, P. L. 1273, §2(b)(2) and (10), 22 P.S. §12(b)(2) and (10).

Smith was observed by appellant were not intentional but purely inadvertent. During the course of an extended automobile surveillance in heavy traffic, it is not an unreasonable occurrence for an investigator's vehicle to pass close by the vehicle he is following. In fact, it was in the investigator's best interests to remain as unobstrusive as possible because if the subject were aware of his presence she would not behave in a natural manner. Moreover, there was no trespassing on appellant's property nor spying through her windows as is present in the cases cited by appellant.[8]

As to the motion pictures, they were a reasonable means of securing evidence to be used at trial. While in the typical case of invasion of privacy, an unauthorized uncomplimentary photograph is given widespread publication causing great humiliation and embarrassment to the subject,[9] in the instant case there was no evidence as to what use was made of the films. There is no evidence to indicate that the films contained embarrassing pictures of appellant, nor is there any evidence in the record as to who viewed these films. The sole purpose of taking these films was to record appellant's movements and daily activities, and if these films disclosed inconsistencies in appellant's claim, any embarrassment suffered by her would be justified.

Counsel for appellant maintains that the defense of social utility is not available to appellee since the insurance company's out-of-court denial of responsibility served as a waiver which binds appellee. We do not agree. In order for a detective to carry out successfully an assignment it is essential that the identity of his client remain secret. See Act of August 21, 1953, P. L. 1273, §14, 22 P.S. §24. Hence, it would have

---

[8] See e.g., *Souder v. Pendleton Detectives*, 88 So. 2d 716 (La. 1956).

[9] See Restatement, Torts §867, illustrations 4 and 6.

frustrated the purpose of the investigation for Guardian to admit that it was responsible for the surveillance. Furthermore, even if Guardian were deemed to have waived its rights, we doubt whether others would be precluded from raising this defense because of the social value of such conduct.

We therefore hold that the facts and circumstances as herein described do not establish that appellant's right to privacy has been invaded.

Turning next to appellant's claim that the conduct of appellee is actionable under the 1948 revision of the Restatement of Torts, we conclude that the facts of this case do not support this contention. Section 46 of the Restatement of Torts states: "One who, without a privilege to do so, *intentionally* causes severe emotional distress to another is liable . . . for such emotional distress." (Emphasis supplied).

In comment a to this section it is stated that the requisite intention is met when the act is done "with knowledge on the part of the actor that *severe emotional distress is substantially certain to be produced* by his conduct." (Emphasis supplied). It is further stated in comment g that the rule imposes liability "in those situations in which the actor's conduct has gone beyond all reasonable bounds of decency. . . . Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor and lead him to exclaim '*Outrageous.*' " (Emphasis supplied).

The court below properly found that appellee, Manchester, did not intend to cause severe emotional distress to appellant. When appellee received the letter from appellant's counsel stating that she was suffering grievous emotional distress as a result of the surveillances, he took it with a "grain of salt" since he had been exposed to so many exaggerated claims in the

past.[10]  Considering the fact that he was never given any amplifying information as to the nature and severity of appellant's nervous disturbance, Manchester, as an experienced and case-hardened private detective conducting an activity surveillance in a perfectly legitimate manner, quite naturally felt that this letter was merely a ruse to halt his investigation.  His sole purpose was to do his job and not to cause emotional distress to appellant.  Under these circumstances, the clear-cut intent required by the Restatement was not established.  In addition, the conduct of appellee cannot be considered "Outrageous," as that term is used in comment g of the Restatement.  The comment and illustrations[11] point to acts of an especially flagrant character, and not to conduct having social value as is present in this case.  See Restatement, Torts §46, comments d and e (1948 Supp.).

Although we sympathize with the plight of appellant, the social value resulting from investigations of personal injury claims and the absence of any wilfulness on the part of appellee require us to deny redress in this case.[12]

Decree affirmed at appellant's costs.

Mr. Justice MUSMANNO and Mr. Justice EAGEN dissent.

---

[10] Since the lower court found for appellee, all testimony and inferences therefrom must be resolved in his favor.

[11] As an example, illustration 1 of Restatement, Torts §46 (Supp. 1948) stated: "As a practical joke, A falsely tells B that he has read in the paper that her son, C, who is a paratrooper in a division known to be then participating in an invasion of enemy territory in wartime, has been reported killed in action.  B grieves over the supposed death of C.  A is liable for the grief which he causes her."

[12] Appellant also raises an evidentiary point which, even if correct, does not constitute prejudicial error.