390 A.2d 240

**Lewis FAIR and Grace Fair, Appellants,**

v.

**Alexander NEGLEY, Appellee.**

Superior Court of Pennsylvania.

Argued Nov. 14, 1977.

Decided July 12, 1978.

Michael J. Kearney, Jr., Braddock, with him Matthew L. Vadnal, Butler, for appellants.

No appearance entered nor brief submitted for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

JACOBS, President Judge:

In the present action, Appellants Lewis and Grace Fair appeal the decision of the Court of Common Pleas of Butler County sustaining the demurrers of Appellee Alexander Negley to both counts of appellants' complaint. In asking us to reverse the trial court, appellants seek an extension of our recent decision to abolish the common law doctrine of caveat emptor as it applies to residential leases and to apply an implied warranty of habitability to all such leases. *Pugh v. Holmes,* 253 Pa.Super. 76, 384 A.2d 1234 (1978). The two major issues raised by appellants are whether the implied warranty may be used as a basis for a complaint and whether the warranty may be waived by agreement of the parties to the residential lease. We hold that the implied warranty is a valid basis for a complaint and that the warranty may not be waived. Furthermore, we reverse the trial court's decision sustaining appellee's demurrer to the second count of appellants' complaint which alleged intentional infliction of emotional distress.

On March 12, 1974, appellants entered into a written rental agreement with appellee for a six room house in Butler, Pennsylvania. Appellants made rental payments of eighty dollars ($80.) per month until they vacated the premises in September, 1975. The clause in the agreement most at issue in this case stated that "premises taken in 'as is' condition, tenant knows the roof has a leak in the same, . . . ." Record at 10a and Appendix at 6.

Appellants filed a two count complaint against appellee. In the first count, they alleged that appellee breached the implied warranty of habitability on the rented premises;

they sought reimbursement for all past rent paid ($1,560) and for excess water bills ($132) caused by appellee's failure to fix the defective water system. As examples of the alleged breach, appellants cited, *inter alia,* improper ventilation of a gas hot water heater and gas space heaters, lack of heat, falling plaster, defective electrical wiring, a malfunctioning water system, defective windows, broken porch steps and railings, and a leaking roof. Appellant's second count alleged that appellee had intentionally inflicted emotional distress upon them through his refusal to make the premises fit for human habitation; they sought $3,000 damages on the second count.

Appellee filed preliminary objections in the form of a demurrer to appellants' complaint. Argument was held on the demurrer and on January 12, 1977, Judge DILLON sustained appellee's demurrer and dismissed appellants' complaint with prejudice. This appeal followed.

We reverse the trial court's action in sustaining appellee's demurrer to the first count and reinstate appellants' complaint. In *Pugh v. Holmes* we held that the implied warranty of habitability may be used as the basis for a defense or for a counterclaim. Here, we hold that the warranty also may be used as the basis for a complaint. Just as with a counterclaim, standard contract remedies are available should appellants prove that appellee breached the implied warranty of habitability. For any time period during which the finder of fact determines that the premises were in an uninhabitable state, appellants may recover the difference between the amount of rent they paid and the reasonable rental value of the premises. Furthermore, they may recover any amount they spent on reasonable reparation and replacement in making the dwelling habitable. Finally, if the fact finder determines that their utility bills were excessive because of the uninhabitable condition of the premises, they may be reimbursed for the amount paid in excess of what their utility bills should have been had the premises been habitable. Of course, in order to succeed on their complaint, appellants must prove that they gave notice

to appellee of the defective conditions, that appellee had a reasonable opportunity to correct the defects, and that he failed to do so. *Pugh v. Holmes,* 253 Pa.Super. at 88, 384 A.2d at 1241 and cases therein cited.

■ The major issue presented by this case is whether the implied warranty may be waived by agreement of the parties. In ruling on the "as is" clause in the lease the trial court adopted Section 2–316 of the Uniform Commercial Code and impliedly found that any warranty of habitability which may have existed had been waived. Act of April 6, 1953, P.L. 3, § 2–316 *as reenacted by* the Act of October 2, 1959, P.L. 1023, § 2, 12A P.S. § 2–316. That section states

> [U]nless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty . . ..

12A P.S. § 2–316(3)(a). While we recognize that our decision in *Pugh v. Holmes* declared that all leases are to be treated as contracts and while we recognize the necessity and value of the freedom to contract between parties, we do not find this language from the Uniform Commercial Code, designed to regulate dealings concerning the sale of goods, controlling in the area of landlord tenant law.[1]

Our initial decision to imply a warranty of habitability in residential leases was based primarily on four factors: the inability of tenants to adequately inspect or repair rental

---

1. If we were to find the language of § 2–316 controlling here, we would find § 2–302 of the Uniform Commercial Code to be controlling, as well. Section 2–302 states that

   > If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

   The Act of April 6, 1953, P.L. 3, § 2–302, *as reenacted by* the Act of Oct. 2, 1959, P.L. 1023, § 2, 12A P.S. § 2–302(1). On the basis of § 2–302, we would find the "as is" clause of the lease to be an unconscionable and ineffective waiver.

units, the disparity of bargaining power between landlord and tenant, the scarcity of housing in the Commonwealth, and the effect of uninhabitable dwellings on the public health and safety. We must now decide whether, despite the doctrine of freedom to contract, a waiver of the warranty would be so against public policy that it should not be permitted in residential leases.

Although "public policy" is a term which escapes easy definition, we agree with Comment (e) to Section 5.6 of the Restatement (Second) of Property which states that "An agreement or provision may be against public policy if it will materially and unreasonably obstruct achievement of a well defined . . . common law policy." The Restatement lists several factors to be considered in determining whether an agreement violates public policy. Upon consideration of those factors applicable to residential leases like the one here at issue, we hold that a waiver of the implied warranty of habitability does violate the public policy sought to be achieved by the warranty and that, therefore, the warranty may not be waived.

One factor is whether the agreement will be counter to statutory and regulatory provisions concerning public health and safety. As we noted in *Pugh v. Holmes,*

> [A]t least one court has found that the continued letting of "tumbledown" houses is " . . . a contributing cause of such problems as urban blight, juvenile delinquency and high property taxes for conscientious landowners." *Pines v. Perssion,* 14 Wis.2d 590, 596, 111 N.W.2d 409, 413 (1961).

253 Pa.Super. at 84, 384 A.2d at 1239. Furthermore, appellants here attached as an exhibit to their complaint a "Notice of City Ordinance Violation" from the Housing Code Enforcement Office of Butler, Pennsylvania to appellee/landlord. The Notice listed seven (7) major defects in the rental premises found by the Code Enforcement Office and ordered to be remedied by appellee. Record at 12a. It is clear that if we were to enforce the alleged waiver of the implied warranty of habitability in this case, we would lend

support not only to obvious violations of Butler ordinances but also to a situation hazardous to the public health and safety.

A second factor for consideration is the relative strength of the bargaining power held by the respective parties. The Courts of our Commonwealth have recognized that tenants in general have little or no bargaining power. In *Reitmeyer v. Sprecher,* the Supreme Court stated,

[M]ost frequently today the average prospective tenant vis-a-vis the prospective landlord occupies a disadvantageous position. Stark necessity very often forces a tenant into occupancy of premises far from desirable and in a defective state of repair. The acute housing shortage mandates that the average prospective tenant accede to the demands of the prospective landlord as to conditions of rental, which, under ordinary conditions with housing available, the average tenant would not and should not accept.

No longer does the average prospective tenant occupy a free bargaining status and no longer do the average landlord-to-be and tenant-to-be negotiate a lease on an "arm's length" basis. Premises which, under normal circumstances, would be completely unattractive for rental are now, by necessity, at a premium. If our law is to keep in tune with our times we must recognize the present day inferior position of the average tenant vis-a-vis the landlord when it comes to negotiating a lease.

431 Pa. 284, 289–90, 243 A.2d 395, 398 (1968). In discussing a lease clause which would exculpate a landlord from liability for personal injury, a situation analogous to waiving the implied warranty of habitability, the Court said,

The exculpatory clause is today contained in every form lease and, understandably enough, landlords are unwilling to strike therefrom that provision which strongly favors them. Thus it is fruitless for the prospective tenant of an apartment to seek a lease having no exculpatory clause. The result is that the tenant has no bargaining power and must accept his landlord's terms. There is no meeting of

the minds, and the agreement is in effect a mere contract of adhesion, whereby the tenant simply adheres to a document which he is powerless to alter, having no alternative other than to reject the transaction entirely. It is obvious that analysis of the form lease in terms of traditional contract principles will not suffice, for those rules were developed for negotiated transactions, which embody the intention of both parties. [Citation omitted.]

*Galligan v. Arovitch,* 421 Pa. 301, 304, 219 A.2d 463, 465 (1966). *See also Commonwealth v. Monumental Properties, Inc.,* 459 Pa. 450, 474–75, 329 A.2d 812, 824 (1974), and *Klein v. Allegheny County Health Department,* 441 Pa. 1, 7, 269 A.2d 647, 651 (1970) for discussions of the housing shortages in the Commonwealth.[2]

A review of the rental agreement in this case gives further support to these particular tenants' lack of bargaining power. Not only did the appellants agree to rent a house with a leaking roof, but also

as a security for the payment of all rent falling due under this lease [appellants grant all right] to the lessor [in] *all the household and kitchen furniture, and all property, good and merchandise of the lessee upon the premises, or to be brought thereon, without any exceptions.* (Emphasis added.)

2. Even assuming that some tenants may possess limited bargaining power, courts have determined that the public policy behind the implied warranty of habitability is more important than any negotiated waiver of the warranty. In at least one case, a court has found that knowledge of the defective conditions and reduced rent are inadequate bases for waiving the implied warranty:

It can be argued, however, that the defendant should not be entitled to the protection of an implied warranty of habitability since he knew of a substantial number of defects when he rented the premises and the rent was reduced from $87 per month to $50 per month. We believe this type of bargaining by the landlord with the tenant is contrary to public policy and the purpose of the doctrine of implied warranty of habitability. A disadvantaged tenant should not be placed in a position of agreeing to live in an uninhabitable premises. Housing conditions, such as the record indicates exist in the instant case, are a health hazard, not only to the individual tenant, but to the community which is exposed to said individual.

*Foisy v. Wyman,* 83 Wash.2d 22, 28, 515 P.2d 160, 164 (1973).

Record at 8a and Appendix at 6. Furthermore, the lease contained a clause granting appellee the right to enter a confessed judgment against appellants for any unpaid rent, or for breach of any of the covenants of the lease. Record at 9a–10a and Appendix at 6. In return for giving up substantially all of their rights as tenants, including the rights to sublet or assign without appellee's permission or to prevent appellee from entering onto the property without their permission, appellants received an uninhabitable dwelling place. A clearer case of disparity of bargaining power and disadvantage to the tenant would be difficult to imagine.

Were we to permit waiver of the implied warranty by an express provision in the lease, it would be a rare lease in which the waiver would not appear. As with the exculpatory clause, few, if any, tenants would be able to find housing on which the warranty had not been waived. To allow such wholesale, unbargained for waiver would make the implied warranty of habitability meaningless.

The third criterion is whether the provision is part of "an unduly harsh and unreasonable standard, 'boilerplate' lease document . . . ." A copy of the lease, as it appears in the reproduced record, is, in essence, boilerplate. The only provisions not in standard style and size of type in the lease are the names of the parties, the date, the address, the rental amount, and the "as is" clause. It is clear, then, that these are the only provisions upon which any negotiations *could* have taken place. In most cases, including this one, it would be unreasonable and unconscionable for a landlord and tenant to voluntarily negotiate for a tenant to live in uninhabitable housing. The "as is" clause, therefore, must be viewed simply as a part of the boilerplate lease agreement.

The final consideration applicable, here, is whether the agreement imposes unreasonable liabilities or burdens on persons financially ill equipped to assume the burdens or on persons without significant bargaining power. Such is certainly the case, here. There is no doubt that appellants

were burdened by the attempted waiver of the habitability warranty. In addition, the printed lease form provided that appellants would pay for "[a]ny damage to building, fixtures, water or gas pipes, during the term of this lease . . . ." Not only, then, did appellee try to avoid having to rent a habitable house but also attempted to have appellants, without finances or bargaining power, maintain the premises after they rented them.

After considering the bases for our decision in *Pugh v. Holmes,* the public policy sought to be advanced by the implied warranty of habitability, and the factors to be employed in determining whether an agreement violates public policy, we can conclude only that an attempted waiver of the implied warranty of habitability in residential leases is unconscionable and must be held to be ineffective. Therefore, waiver is not a valid defense to a complaint based upon the warranty.

Finally, appellants allege that the trial court erred in sustaining appellee's demurrer to count two of their complaint which alleged intentional infliction of emotional distress. We agree and, therefore, reverse the court's ruling on the demurrer.

As defined by Section 46 of the Restatement (Second) of Torts,

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

While we refuse to hold that a breach of the implied warranty of habitability constitutes intentional infliction of emotional distress as a matter of law, we do hold that appellants have the right to allege and to try to prove that appellee, by breaching the warranty, has intentionally inflicted emotional distress upon the appellants. At least one other court has reached a similar conclusion in the context of a landlord/tenant case. *Aweeka v. Bonds,* 20 Cal.App.3d

278, 97 Cal.Rptr. 650 (1971). The Restatement (Second) of Torts also notes that landlords previously have been held liable for intentional infliction of emotional distress "for extreme abuse of their position." § 46, comment (e).

"Preliminary objections in the nature of a demurrer should be sustained only where it appears with certainty that upon the facts averred the law will not permit the plaintiff to recover." *Papieves v. Kelly,* 437 Pa. 373, 381, 263 A.2d 118, 122 (1970). Upon reviewing the record in this case, we find that appellants alleged sufficient facts in both counts of their complaint to overcome a ruling against them as a matter of law. Accordingly, we reverse the ruling of the lower court, reinstate appellants' complaint, and remand this case for proceedings consistent with this opinion.

VAN der VOORT, J., joins this opinion as to Count I.

CERCONE, J., concurs in the result.

SPAETH, J., files a concurring opinion.

PRICE, J., files a dissenting opinion, in which VAN der VOORT, J., joins as to Count II.

WATKINS, former President Judge, did not participate in the consideration or decision of this case.

SPAETH, Judge, concurring:

I join in the majority opinion. I do not understand it, however, to preclude a bona fide agreement whereby parties of equal bargaining power shift the obligation to render the leased premises habitable. For example, suppose a landlord has obtained residential zoning for the use of loft space. It should not, I think, be impossible for the landlord and a prospective tenant to agree that for a reduced amount of rent, the tenant, rather than the landlord, will make such agreed upon improvements as are necessary to make the premises fit for human habitation. The enforcibility of such an agreement would depend upon a showing of a bona fide understanding, between parties of equal bargaining power, that such improvements will in fact be made. In such

circumstances the landlord's obligation to ensure compliance with the warranty would remain in full effect; the agreement would merely shift the obligation of performance of the agreed terms.

PRICE, Judge, dissenting:

Once again, the majority has elected to make a significant change in landlord-tenant law in this Commonwealth in order, in its opinion, to remedy inadequacies in today's residential housing. I dissent for the reasons stated in my dissenting opinion in *Pugh v. Holmes,* 253 Pa.Super. 76, 384 A.2d 1234 (1978).

The law in Pennsylvania has always been that while a landlord may expressly covenant premises as tenantable, there is no implied warranty to that effect, and the landlord has no ongoing duty of repair. *Lopez v. Gukenback,* 391 Pa. 359, 137 A.2d 771 (1958). The majority, however, has deemed it appropriate to adopt an implied warranty of habitability in residential leases. I adhere to my conviction that responsibility for such a change, if it is to be made, rests with the legislature, so that exact standards may be formulated and a rent-withholding mechanism may be established. I can foresee several problems which the *Pugh* majority did not intend, but which will inevitably flow from this court's adoption of an implied warranty of habitability in residential leases. The purpose of that decision was to reduce the shortage of decent dwellings available, particularly to low income tenants. Most assuredly, the cost of repairs will be passed on to the tenant through increased rent. But a more detrimental result of *Pugh* is that many owners of marginal housing may deem the cost of repairs too substantial and the return on investment too questionable, and they will opt to close dwellings, thereby compounding the housing problem.

Beyond that, I find the further extension of the *Pugh* case by the majority absolutely offensive to contract principles. *Pugh* maintained that a lease should be viewed as a contract, and that the covenants of the two parties thereto must be

read as dependent. Yet in this case, the court ignores the contractual provisions of the agreement into which the two parties entered. One clause of the lease provides: "Premises taken in as is condition, tenants know the roof has a leak in the same."

The Uniform Commercial Code, Section 2–316(3)(a) provides:

"[U]nless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty . . . ." [1]

The majority declares that "an attempted waiver of the implied warranty of habitability in residential leases is unconscionable and must be held to be ineffective." (Majority opn. at 245). Although Article 2 of the Uniform Commercial Code covers only the sale of goods, the freedom of contract which it recognizes in such transactions should likewise be acknowledged in the landlord-tenant relationship, which the majority has dubbed a contractual one. One should be free to bargain for premises of lesser quality to secure housing at a cheaper cost, if that is desired. At the very least, appellants in this case should not be entitled to any relief for alleged damages attributable to the leaking roof, a defect specified in the contract and accepted by appellants from the start of their tenancy. Instead, the majority is holding that as a matter of law, no waiver of the implied warranty of habitability will be upheld by our courts.

An additional problem which I have with the majority's decision in the instant case is that the complaint fails to allege notice to the landlord of the defects or the passage of a reasonable time after notice to permit repairs. Appellants' complaint states:

"7. The majority of the above defects were reported to the Defendant, Alexander Negley, as violations of the

1. The Act of April 6, 1953, P.L. 3, § 2–316, *as reenacted by* the Act of October 2, 1959, P.L. 1023, § 2 [12A P.S. § 2–316].

City Ordinances. (A copy of the notice is attached hereto and made a part hereof as 'Exhibit B')."

The attached exhibit is a memorandum from the Housing Code Enforcement Office of Butler, Pennsylvania, enumerating several violations of city ordinances. This notice is dated September 5, 1975. Appellant's complaint alleged that conditions rendering the leased premises uninhabitable entitled them to recovery of all rent which they paid from the inception of the lease, on March 12, 1974, through September, 1975, when they vacated the premises.[2] Even if the implied warranty is applied in this case, the complaint indicates that appellee received no notice of the complained of conditions until September. Thus, he cannot reasonably be held liable for breaching a warranty which requires that the tenant give notice and allow a reasonable time for repairs. The complaint thus fails to allege a cause of action against the landlord, and a demurrer was properly sustained.

Appellants' second contention is that the lower court erred in sustaining the landlord's demurrer to count two of their complaint which alleged intentional infliction of emotional distress. It is on the basis of the Restatement (Second) of Torts, Section 46, that the majority reverses the lower court's ruling. That section provides:

"(1) One who by *extreme and outrageous conduct* intentionally or recklessly causes *severe emotional distress* to another is subject to liability for such emotional distress. . . ." (Emphasis added).

As recognized in the comments following Section 46, intentional infliction of mental distress is a tort that has not enjoyed very rapid acceptance or enlargement. It is very difficult to prove. Still, in cases in which conduct could be labeled extreme or outrageous, a cause of action has been recognized. In this regard, Comment (d) provides in part:

"It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has

2. The complaint does not indicate the exact date on which appellants moved from the premises, but it does state that it was during September.

intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

Comment (d) further recognizes that:

"The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."

Regarding the degree of emotional harm necessary to a finding of intentional infliction of emotional distress, Comment (j) provides in part:

"Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and duration of the distress are factors to be considered in determining its severity."

One of the chief difficulties in recovering under Section 46 is establishing that the alleged tortfeasor acted with specific intent to cause emotional distress. *See Forster v. Manchester,* 410 Pa. 192, 189 A.2d 147 (1963). The leasing of low income housing is generally necessitated by the need of indigents and is prompted by landlords' economic interests; it is not motivated by the intent to cause tenants emotional distress. Further, I find the assertion that failure to repair in the landlord-tenant situation constitutes severe and outrageous conduct to be without merit. Such conduct does not rise to the level of other reprehensible actions for which a cause of action has been recognized. *E. g., Papieves v. Kelly,* 437 Pa. 373, 263 A.2d 118 (1970) (parents have cause of action for intentional mishandling of body of deceased son). Additionally, in the instant case, the implied warranty

which the majority would read into every residential lease has been disclaimed. Therefore, the landlord had no duty to make the necessary repairs of which appellants complain. From the face of the complaint it is clear that the landlord did not even have notice of the desired repairs until September 5, 1975. It is therefore inconceivable that he was intentionally inflicting emotional distress upon appellants when he did not realize their alleged plight during the months for which appellants seek relief.

The majority cites *Aweeka v. Bonds*, 20 Cal.App.3d 278, 97 Cal.Rptr. 650 (1971), in which the court held that the plaintiff had stated a cause of action by claiming punitive damages for eviction and intentional infliction of emotional distress. I concur in the assessment of Justice Kane, who wrote in his dissent:

"At a time when the judicial system is laboring under a load which includes an inordinate quantity of needless, and often frivolous, vexatious litigation, the effect of the majority's decision is to create yet another breeding ground." *Id.* at 283, 97 Cal.Rptr. at 653.

I would affirm the ruling of the lower court.

VAN der VOORT, J., joins this opinion as to Count II.