## Wagner & Tolbert, Inc. v. Tompkins

*Henry F. Coyne*, for plaintiff.
*John R. Zonarich*, for defendant.

SHUGHART, *P.J.*, February 21, 1979—Plaintiff, Wagner & Tolbert, Inc., landlord, filed an action in assumpsit against defendant, Robert R. Tompkins, M.D., tenant, on December 20, 1977, alleging a breach of a lease agreement between the parties concerning a lease of office and surgery facilities. On January 17, 1978, defendant filed an answer with new matter and a counterclaim. On March 23, 1978, an amended answer with new matter and a counterclaim was filed. Plaintiff filed a reply to new matter and counterclaim on June 9, 1978. On August 11, 1978, plaintiff filed a motion for judgment on the pleadings with respect to paragraphs (21), (22), and (24) of defendant's counterclaim, which is now before us.

## DISCUSSION

Paragraph (21) of defendant's counterclaim reads in pertinent part: "Plaintiff failed, despite repeated requests of the defendant, to repair a leak in the ceiling of the surgery room so that during heavy rains the utility of the premises was reduced and damage occurred to furnishings and supplies in the surgery room. The leak continued from September, 1969 through October, 1977. . . . "

Paragraphs (8) and (12) of the lease agreement read as follows:

"8. Lessor shall not be held responsible for and is hereby expressly relieved from any and all liability by reason of any injury, loss or damage to any person or property in or about the demised premises. . . due to. . . leakage. . . or any other cause whatsoever, which liability is expressly assumed by the Lessee, whether the loss, injury or damage be to the person or property of the Lessee or any other person.

"12. Lessor shall not be liable for any damage to any property at any time in said premises or buildings from water, rain, steam, gas, or snow, which may leak into, issue, or flow from, any part of said building, or from the tanks, pipes, or plumbing works of the same, or from any other place or quarter."

Plaintiff's basis for judgment is that the exculpatory clauses contained in the above provisions of the lease preclude any recovery by defendant for damage due to the leaky roof. We must determine initially if the exculpatory clauses in the lease as they apply to defendant's counterclaim are valid.

"Generally speaking, an exculpatory clause is

valid if: (a) 'it does not contravene any policy of the law, that is, if it is not a matter of interest to the public or State. . . . ' [citations omitted]; (b) 'the contract is between persons relating entirely to their own private affairs' [citations omitted]; (c) 'each party is a free bargaining agent' and the clause is not in effect 'a mere contract of adhesion, whereby [one party] simply adheres to a document which he is powerless to alter, having no alternative other than to reject the transaction entirely' [citations omitted]." Employers Liability Assurance Corporation v. Greenville Business Men's Association, 423 Pa. 288, 291-292, 224 A. 2d 620, 622-623 (1966).

See also Kotwasinski v. Rasner, 436 Pa. 32, 258 A. 2d 865 (1969); Galligan v. Arovitch, 421 Pa. 301, 219 A. 2d 463 (1966).

In Pugh v. Holmes, 253 Pa. Superior Ct. 76, 384 A. 2d 1234 (1978), the court held that all *residential* leases in Pennsylvania include an implied warranty of habitability and expressly overruled the doctrine of caveat emptor as applied to *residential* leases. In Fair v. Negley, ____ Pa. Superior Ct. ____, 390 A. 2d 240 (1978), the court was faced with the question of whether the warranty of habitability could be waived by agreement of the parties.[1] In setting forth the issue Judge Jacobs stated:

"Our initial decision to imply a warranty of habitability in *residential* leases was based primarily

---

1. The court recognized that the issue before it was essentially whether an exculpatory clause in a residential lease should be permitted to shield the landlord from liability for a breach of the implied warranty.

on four factors: the inability of tenants to adequately inspect or repair rental units, the disparity of bargaining power between landlord and tenant, the scarcity of housing in the Commonwealth, and the effect of uninhabitable dwellings on the public health and safety. We must now decide whether, despite the doctrine of freedom to contract, a waiver of the warranty would be so against public policy that it should not be permitted in *residential* leases." Id. at ____, 390 A. 2d at 243. (Emphasis supplied.)

In holding the waiver invalid, the court held: "After considering the bases for our decision in Pugh v. Holmes, the public policy sought to be advanced by the implied warranty of habitability, and the factors to be employed in determining whether an agreement violates public policy, we *can conclude only that an attempted waiver of the implied warranty of habitability in residential leases is unconscionable and must be held to be ineffective.*" Id. at ____, 390 A. 2d at 245. (Emphasis supplied.)

Some of the factors considered by the court in determining whether the attempted waiver was against public policy included, among other things, the relative bargaining strength of the parties, whether the lease provisions relied upon by the landlord were standard "boilerplate" provisions which were unduly harsh and unreasonable, and whether the agreement imposed an unreasonable burden on persons financially unable to assume them or on persons without significant bargaining strength.

We believe that as a general rule the public policy furthered by the implied warranty of habitability in *residential* leases is not applicable in *commercial*

leases such as the one in the case at bar. In a commercial context, the financial and bargaining strength of the parties does not approach the disparity which often exists in residential landlord-tenant situations. The lessee in a commercial lease is not likely to accept the terms of a lease without examining their content. In addition, it is much more likely that the bargaining power of the lessee in a commercial lease could influence the terms and conditions of the lease, a situation which would be a rarity in a residential lease. Defendant here, a medical doctor by profession, is hardly in a position to argue that he did not realize or understand the terms of the lease without pointing to specific ambiguity in their language. Given the inherent differences between residential and commercial leases, we hold that they are sufficiently distinguishable so as to conclude that there is no public policy which would per se invalidate an exculpatory clause in a commercial lease.[2] Further, we hold that the instant exculpatory provisions satisfy all of the other requirements cited previously in order to establish its validity. However, where it is determined that the provisions are valid on their face, our case law has required that certain established standards be met before one may be relieved of liability for his own acts of negligence.

"Such standards are: (1) contracts providing for immunity from liability for negligence must be

2. A different result would follow if it could be shown, as in the case of Warren City Lines, Inc. v. United Refining Company, 220 Pa. Superior Ct. 308, 287 A. 2d 149 (1971), that the exculpatory clause in question violated a statute or regulation promulgated by an official body.

construed strictly since they are not favorites of the law; (2) such contracts 'must spell out the intention of the parties with the greatest of particularity' and show the intent to release from liability 'beyond doubt by express stipulation' and '[no] inference from words of general import can establish it'; (3) such contracts must be construed with every intendment against the party who seeks the immunity from liability; (4) the burden to establish immunity from liability is upon the party who asserts such immunity. [All citations omitted.]" Employers Liability Assurance Corporation v. Greenville Business Men's Association, supra, at 292-293, 224 A. 2d at 623.

See also Kotwasinski v. Rasner, 436 Pa. 32, 258 A. 2d 865 (1969); Warren City Lines, Inc. v. United Refining Company, 220 Pa. Superior Ct. 308, 287 A. 2d 149 (1971).

Turning to the exculpatory clause asserted by plaintiff as a defense to the counterclaim, we conclude that the subject matter covered by the release and the nature of the release itself leave no doubt as to what the parties intended by the provisions in question. Paragraph 8 of the lease makes it crystal clear that plaintiff is not liable for personal injury or property damage due to "leakage" of any sort. Further, liability for such damage is placed upon defendant by express stipulation. In addition, paragraph 12 of the lease relieves plaintiff for property damage due to water leakage from the building itself "or from the tanks, pipes or plumbing works of the same. . . . " Because we find that paragraph 21 of the counterclaim is expressly covered by the exculpatory provisions and because we find that

the provisions are valid and enforceable, judgment on the pleadings must be granted in favor of plaintiff.

Paragraph 22 of defendant's counterclaim alleges damages for the failure of plaintiff to provide janitorial services pursuant to the express terms of the lease. In its motion for judgment, plaintiff raises paragraph (11) of the lease agreement as a defense, which reads in pertinent part: "Lessor will . . . cause said demised premises to be cleaned and cared for . . . In consideration of the fact that no extra charge is made for . . . janitorial services, Lessor shall not be liable in any way for any failure to supply the same, nor shall such failure be construed to be a breach of the lease on the part of the Lessor."

We believe that this exculpatory clause stands on a different footing than the one releasing plaintiff due to "leakage." Although we have already held that the exculpatory provisions in the lease between these parties is technically valid, we must determine in each situation whether the standards set for enforceability have been met. While we found in the previous provision all the requisites for enforceability, we cannot say that the above clause clearly and expressly establishes the intent of the parties with regard to the janitorial services. Although the lease states that no extra charge was made for janitorial services; it would be, therefore, unrealistic to believe that plaintiff's promise to provide janitorial services was not considered by defendant to be in return for his promise to pay rent. We find support for this position in the additional language of paragraph (11) not referred to above in which plaintiff also promised to provide such es-

sentials as heat and light which would obviously have been a critical factor in determining the amount of rent to be charged defendant for the premises and most certainly would have been a significant consideration in defendant's decision to lease the premises. However, just as with the janitorial services, plaintiff attempted to exculpate himself from liability for failure to provide even these bare essentials. What plaintiff has attempted to do is to unilaterally take back some of the consideration of the lease without being held liable. Under these circumstances we hold that the clause is unenforceable due to the failure to set forth the intent with the required particularity at the time the parties entered into the agreement.

Lastly, defendant, in paragraph (24) of his counterclaim, claims damages for the failure of plaintiff to keep the building open to the public during the hours stated in paragraph (20) of the Rules and Regulations of the lease and attached thereto. Plaintiff raises as a defense to this claim the language in paragraph (20) of the lease which states: "The Lessor shall in no way be liable in damages for the admission or exclusion of any person from said building."

The statement made regarding the exculpatory clause as to janitorial services is applicable here. Plaintiff committed itself in the lease to keep the premises open during certain hours crucial to defendant's practice of medicine. This promise would have necessarily been of great importance to defendant. Just as with the previous clause, plaintiff has promised on the one hand to keep the premises open during specified hours yet on the other hand has attempted to obtain a release for his failure to do the same. Under these circumstances, we refuse

to give effect to the clause based on its ambiguity and failure to expressly set forth the clear intent of the parties.

## ORDER

And now, February 21, 1979, for the reasons stated in the opinion filed this date, plaintiff's motion for judgment on the pleadings is denied with respect to paragraphs 22 and 24 of the counterclaim and granted with respect to paragraph 21.