For the foregoing reasons, the judgment of the District Court is AFFIRMED.

**Robert CLARK and Billie Clark, husband and wife; Robert Anson Clark, a minor child by and through his mother and next friend, Billie Clark; Brandi Jones and Britini Jones, minor children by and through their mother and next friend, Angela Marie Jones; Brandon Neal Clark, a minor child by and through his mother and next friend, Mary Lou Duvall, Plaintiffs–Appellees,**

v.

**Thomas William BRIEN, representative of Underwriters at Lloyd's London, Defendant–Appellant.**

**and**

**Sphere Drake Insurance Company, Defendant.**

No. 94–6099.

United States Court of Appeals, Tenth Circuit.

July 14, 1995.

**1084**

Mickey James of Green, James & Williams, Oklahoma City, OK (and Marcie James of Green, James & Williams, with him on the brief), for defendant-appellant.

Jack F. Tracy of Blythe, Tracy & Baumgardner, Purcell, OK, for plaintiffs-appellees.

Before EBEL and KELLY, Circuit Judges, and BROWN,[*] District Judge.

EBEL, Circuit Judge.

The Plaintiffs brought this diversity action against Thomas William Brien ("Brien"), as a designated representative of Underwriters at Lloyd's London ("Lloyd's"), for the intentional infliction of emotional distress.[1] The Plaintiffs claim that Lloyd's should be held liable for the conduct of several guards, hired to surveil the Plaintiffs' property, who allegedly shot the Plaintiffs' pet dog. A jury found for the Plaintiffs and awarded them actual and punitive damages. The district court denied Lloyd's Rule 50(b) motion for judgment as a matter of law and Lloyd's brought this appeal. Because we find that there was insufficient evidence for a reasonable jury to hold Lloyd's responsible for the guards' conduct under the doctrines of principal-agent liability, we reverse the court's denial of Lloyd's motion and order judgment entered in favor of Lloyd's.[2]

## BACKGROUND

In 1988, Robert Clark and his wife Billie Clark purchased an insurance policy on their homestead. The policy was issued jointly by Lloyd's and by Sphere Drake Insurance Company ("Sphere Drake"). In 1989, the Clarks contacted their insurance agent to clarify whether this policy also covered a separate home in which the Clarks held a financial interest, which had been destroyed by fire. This inquiry prompted Lloyd's to have its authorized agent, Acton Inc., hire an independent adjuster to obtain information on the Clarks. The adjuster, Bill Bigbee ("Bigbee"), under the oversight of his supervisor, Bill Starbuck ("Starbuck"), discovered that the Clarks had failed to disclose their involvement in numerous fires in the recent past, one or more of which had destroyed houses on the very property that Lloyd's and Sphere Drake were insuring. Based on this information, Acton Inc. mailed the Clarks a notice of cancellation of their insurance policy on January 19, 1989. Abiding by the policy's requirement to provide thirteen days notice,

---

[*] The Honorable Wesley E. Brown, Senior District Judge, United States District Court for the District of Kansas, sitting by designation.

1. Although Brien is the named defendant in this case, the parties stipulated that Brien is named solely in his capacity as a representative underwriter of Lloyd's, which is not an insurance company that can be sued easily as an entity. *See* Aplt's App. Vol. I, at 108, 141–42. The parties agreed that Brien was named solely "to avoid the burdensome procedure of naming as defendants each underwriter subscribing the policy." *Id.* Because a judgment binding Brien as the representative defending underwriter "binds all underwriters subscribing the policy," this opinion will refer for convenience to the Defendant as "Lloyd's," rather than as the named representative. *Id.*

2. We also deny Appellees' motion to file a surrebuttal brief.

the cancellation was set to take effect on February 1, 1989.

On January 23, 1989, Robert Clark informed Acton Inc. that he would be away from his property for several days. The head of Acton Inc., Max Acton, feared that the Clarks' homestead might mysteriously burn down before the policy cancellation could take effect, so he had several off-duty firefighters and police officers hired to surveil the Clarks' property during the interim period between January 23rd and 31st. The guards were instructed to watch the Clarks' homestead from an adjoining lot and notify the fire department if they saw any signs of fire. Evidence suggests that Acton Inc. or Starbuck may also have hired a separate investigator, Donald Leonard, to photograph the Clarks' property and any people entering or leaving the Clarks' home.

Based on alleged misconduct by the guards and Bigbee during this period of surveillance, the Clark family filed suit against Lloyd's and Sphere Drake as the joint issuers of their insurance policy. The Clarks claimed that the guards committed trespass and intentional infliction of emotional distress, for which Lloyd's and Sphere Drake should be held responsible under the theory of principal-agent liability. The Plaintiffs include Robert and Billie Clark, their son Robert Anson Clark, their granddaughters Britini and Brandi Jones (brought by the granddaughters' mother, Angela Marie Jones), and their grandson Brandon Neal Clark (brought by the grandson's mother, Mary Lou Duvall), all of whom allegedly suffered severe emotional distress from the guards' behavior.[3]

At trial, members of the Clark family testified that the guards did not just passively surveil their homestead from the adjoining lot, but also trespassed upon their land. Because Robert Clark did not know who the guards were or the reason for their presence, he claims that he became very concerned about his family's safety, and even decided to drive his visiting in-laws back to their hometown out of fear for their well-being. Upon returning home, Robert Clark found his wife, son, and three grandchildren inside the house with the doors locked. The children were upset and said that one of the guards had shot and killed their pet dog, Bandit. When Robert Clark went outside to investigate, he found a pool of blood on his property and evidence that the dog had been dragged over their fence. Although the Clarks believed that one of the guards was responsible for the shooting, other evidence suggested that Bigbee, the independent adjuster that Acton Inc. hired to gather information on the Clarks, may have been involved.

At the end of the surveillance period on January 31, 1989, Lloyd's was provided its first information about these events. Max Acton faxed a letter to Lloyd's explaining that Acton Inc. had cancelled Lloyd's insurance policy on the Clarks' homestead based on the independent adjuster's discovery of the Clarks' prior fire losses. The letter informed Lloyd's only that Acton Inc. had "hired four guards around the clock to keep [Robert Clark] from burning [his] house." On February 3, Lloyd's faxed a response to Acton Inc. saying that the leading underwriter "agrees fully with your actions," but "await[s] full details." On February 10, Lloyd's faxed a second response to Acton Inc. which said that after consulting with an attorney the underwriters "fully agree with Max Acton's actions to date."

At the close of evidence at trial, Lloyd's made a Rule 50(a) motion for judgment as a matter law. The district court denied the motion and submitted the trespass and tort claims to the jury. The jury found for Sphere Drake on both the trespass and intentional infliction of emotional distress claims and for Lloyd's on the trespass claim. However, the jury found against Lloyd's on the intentional infliction of emotional distress claim and awarded the Plaintiffs actual and punitive damages. Lloyd's filed a Rule 50(b) renewed motion for judgment as a matter of law on the intentional infliction of emotional

---

**3.** The Plaintiffs also brought claims for breach of contract, bad faith breach of contract, invasion of privacy, false imprisonment, and various constitutional and state statutory violations. However, these claims were disposed of before the case was submitted to the jury and are not before us on this appeal. The original suit also included claims by and against additional parties. Those claims have since been removed from this case and are also not before us on this appeal.

distress claim. The district court denied Lloyd's this motion and Lloyd's brought this appeal. Thus, Lloyd's is the only defendant in this appeal and the intentional infliction of emotional distress claim is the only claim at issue.

## ANALYSIS

■ In reviewing the denial of Lloyd's motion for judgment as a matter of law after trial, we apply the same standard as the district court to decide if, viewing the record in the light most favorable to the Clarks, there is evidence upon which a reasonable jury could properly find against Lloyd's. *See Aguinaga v. United Food & Commercial Workers Int'l Union*, 993 F.2d 1463, 1469 (10th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 880, 127 L.Ed.2d 75 (1994). Lloyd's argues that judgment as a matter of law is warranted on the intentional infliction of emotional distress claim because: (1) the guards' conduct cannot be considered "outrageous" as a matter of law; and (2) even if the guards' conduct could be considered outrageous, there was insufficient evidence from which a jury could hold Lloyd's liable for that conduct. Because we agree with the second argument, we reverse the district court's denial of Lloyd's renewed motion for judgment as a matter of law.[4]

In order to prevail on their intentional infliction of emotional distress claim, the Plaintiffs had to establish two things. First, they had to prove that the guards intentionally or recklessly caused them severe emotional distress through conduct that was " 'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *See Eddy v. Brown*, 715 P.2d 74, 75 (Okla.1986) (quoting Restatement (Second) of Torts, § 46 cmt. d. (1977)).[5] Second, the Plaintiffs had to prove that Lloyd's should be

held responsible for the guards' conduct under the doctrines of principal-agent liability.

■ It is the court's duty to determine whether the conduct at issue reasonably may be regarded as "outrageous" before submitting the claim to a jury. *Eddy*, 715 P.2d at 76–77. In this case, we do not believe that the alleged surveillance, by itself, could be considered outrageous as a matter of law. *See, e.g., Forster v. Manchester*, 410 Pa. 192, 189 A.2d 147, 148–52 (1963) (applying Restatement (Second) of Torts § 46 to hold that it was not outrageous for insurance company's investigators to follow plaintiff and videotape her to verify her injuries); *Pemberton v. Bethlehem Steel Corp.*, 66 Md.App. 133, 502 A.2d 1101, 1105–06, 1115 (Md.Ct. Spec.App.) (applying Restatement (Second) of Torts § 46 to hold that employer's alleged surveillance of plaintiff's "comings and goings" was insufficiently outrageous to survive summary judgment), *cert. denied*, 306 Md. 289, 508 A.2d 488 *and* 479 U.S. 984, 107 S.Ct. 571, 93 L.Ed.2d 575 (1986). Only by considering *both* the surveillance *and* the shooting of the Clarks' dog could the alleged conduct be regarded as sufficiently outrageous to submit the tort claim to the jury. *Cf. Reeves v. Melton*, 518 P.2d 57, 60–63 (Okla.Ct.App. 1973) (finding that the combination of an agent's repeated visits to plaintiffs' home, trespass on plaintiffs' property, and threats to kill plaintiffs' dogs was sufficiently outrageous to support a jury finding for plaintiffs). Thus, the Plaintiffs had to produce evidence at trial from which a jury reasonably could hold Lloyd's liable for *both* the guards' surveillance *and* their alleged shooting of the dog.

■ For Lloyd's to be liable for the guards' actions, the Plaintiffs had to show that the guards were Lloyd's agents and: (1) that the guards were acting within the scope of their authority and in the course of their

---

**4.** This disposition makes it unnecessary for us to address Lloyd's alternative arguments that: (1) the denial of Lloyd's motion for judgment as a matter of law should be reversed with respect to Brandon Clark because there was insufficient evidence regarding Brandon Clark's damages; (2) the denial of Lloyd's motion for judgment as a matter of law should be reversed with respect to all plaintiffs other than Robbie Clark because Robbie Clark was the sole owner of the dog; and (3) the district court erred in denying Lloyd's alternative motion for a new trial.

**5.** Because this case was filed based on diversity jurisdiction, Oklahoma law applies.

employment, *Hill v. McQueen,* 204 Okla. 394, 230 P.2d 483, 484 (1951), or (2) that Lloyd's ratified the guards' acts with knowledge of all the material facts, *Urabazo v. Humpty Dumpty Supermarkets,* 463 P.2d 352, 354 (Okla.Ct.App.1969). There was clearly sufficient evidence at trial from which a jury could find that the guards were Lloyd's agents, because they had been hired on Lloyd's behalf by Acton Inc., Lloyd's undisputed authorized business agent. However, Lloyd's argues that there was no evidence that the guards' conduct, particularly the shooting of the Clarks' dog, was either within the scope of the guards' authority or knowingly ratified by Lloyd's.

### Scope of Authority

■ Conduct falls within an agent's scope of authority if the agent has actual or apparent authorization to take a specific act on the principal's behalf. An act is also deemed within an agent's scope of authority if it is within the scope of his employment and taken in furtherance of the principal's business. *See Tulsa General Drivers Union v. Conley,* 288 P.2d 750, 754 (Okla.1955) (per curiam). After reviewing the trial record in light of these standards, we agree with Lloyd's that there was insufficient evidence from which a jury could find that shooting the Clarks' dog was within the scope of the guards' authority.

Max Acton testified that he employed the guards for the limited purpose of watching the Clarks' homestead from the adjoining property and notifying the fire department if they saw signs of fire. The guards all testified similarly, stating that they were hired solely to watch the Clarks' home from the adjoining lot and to contact the fire department if they saw any indication of fire. It was undisputed that the guards had permission to enter the property adjoining the Clarks' land and that they were not authorized to enter the Clarks' property. Although some of the off-duty officers acknowledged that they had their guns with them during the surveillance period, there was no evidence from which a jury could find that the guards were authorized to use a firearm or that Lloyd's knew they had guns. To the contrary, testimony indicated that the guards were expressly instructed that "no guns" were allowed. Based on this evidence, a jury could not reasonably find that the guards were authorized to shoot the Clarks' dog.

Shooting the Clarks' dog also could not reasonably be considered incidental to and in furtherance of an authorized act. Shooting the dog was not related to nor would it have advanced the guards' limited employment duties of watching for and reporting signs of fire. *Cf. Tulsa General,* 288 P.2d at 753 (holding that an agent's assault on the target of a picketline could not "properly be contemplated as an incident to the exercise of ordinary authority to act as a peaceable picket"). The guards were not instructed to conceal themselves and did not attempt to do so, so shooting the dog could not have been done to prevent the dog from revealing the guards' presence.[6]

■ Oklahoma courts have repeatedly endorsed the general rule that an agent's tortious or criminal assault on a third party cannot be considered within the scope of the agent's authority, unless the assault could have been "anticipated by the employer" as a foreseeable means of accomplishing the job for which the agent was employed. *See, e.g., Allison v. Gilmore, Gardner & Kirk, Inc.,* 350 P.2d 287, 290–92 (Okla.1960) (holding that employer was not liable when employee got into a fight with a third party who challenged the way the employee was doing his job); *Tulsa General,* 288 P.2d at 753 (holding

---

**6.** A private detective named Ricky Lee did testify as an expert that surveillance generally is considered unsafe and improper unless it is done covertly. However, Lee's testimony provided no evidence from which a jury could find that the guards in question were instructed to or attempted to conceal themselves from the Clarks. The testimony was relevant only to the issue of whether the guards' conduct could be considered extreme or outrageous.

There was also some evidence that Donald Leonard, the man who may have been hired by either Acton Inc. or by one of Acton Inc.'s employees to photograph the Clarks' property, had attempted to conceal himself. However, there was no evidence that Leonard was involved in the dog incident, so shooting the dog could not reasonably have been regarded as incidental to his alleged employment.

that " '[i]t is not, as a general rule, within the scope of the servant's employment to commit an assault upon a third person and the master is not liable for such an assault, though committed while the servant was about his master's business' ") (quoting 2 Cooley on Torts (3d ed.) at 1037). Because shooting a dog "is not a recognized or usual means resorted to" for accomplishing non-covert surveillance, *see Hill,* 230 P.2d at 486, it could not have been "anticipated by the employer," *see Allison,* 350 P.2d at 292, and Lloyd's therefore could not be liable for it.

■ As noted above, some evidence suggested that it was not one of the guards but rather Bigbee, the independent adjuster hired by Acton Inc., who was involved in shooting the dog. Even assuming that the jury could have found that Bigbee did the shooting, we reach the same conclusion on the issue of Lloyd's liability as Bigbee's principal. It was undisputed that Bigbee was hired to gather information on the Clarks in order to adjust their insurance claim. There was no evidence from which a jury reasonably could have found that shooting the Clarks' dog was a foreseeable means of furthering those duties, or that it could be considered incidental to or within the scope of Bigbee's limited authority to act on Lloyd's behalf.

### Ratification

A principal may still be held liable for an act that is beyond the scope of an agent's authority if the principal ratifies the act. *Urabazo,* 463 P.2d at 354. Thus, if the Plaintiffs offered sufficient evidence from which a reasonable jury could find that Lloyd's affirmed the guards' or Bigbee's conduct, the verdict could still be upheld.

■ For ratification to be valid, it must be done "with knowledge of the material facts." Aplt's App. at 119 (jury instr. 21); *see Beard v. Herndon,* 84 Okla. 142, 203 P. 226, 229 (1921) (" 'A ratification in express terms and with knowledge of the facts of what an agent has done is, of course, equivalent to a prior authority.' ") (quoting 31 Cyc. 1262, 1263); *Mason v. Nibel,* 129 Okla. 7, 263 P. 121, 122 (1928) (per curiam) ("[T]he master is not bound unless he ratifies the unau-

thorized acts of the servant . . . with knowledge of what had been done by the servant. . . ."). After reviewing the record, we find insufficient evidence from which a jury reasonably could find that Lloyd's knowingly ratified the conduct that forms the basis of the Plaintiffs' tort claim.

As evidence of Lloyd's ratification, the Plaintiffs point to three letters exchanged between Acton Inc. and Lloyd's after the surveillance was completed. Acton Inc. first faxed a letter to Lloyd's on January 31, 1989, informing Lloyd's that it had cancelled the Clarks' insurance policy after its independent adjuster had learned about the Clarks' prior fire losses, and had "hired four guards around the clock to keep [Robert Clark] from burning [his] house." There was no evidence in the record that Lloyd's possessed any other information about the events that allegedly occurred during the surveillance. Based solely on the information provided in Acton Inc.'s letter, Lloyd's faxed a response letter to Acton Inc. on February 3, stating that the leading underwriter "agrees fully with your actions," but "await[s] full details." On February 10, Lloyd's faxed a second response to Acton Inc. which said that the underwriters had consulted with an attorney and "fully agree with Max Acton's actions to date."

Because there was no evidence in the record that Lloyd's knew when it faxed its two responses that the guards had possessed firearms or that a guard or the independent adjuster shot the Clarks' dog, the letters cannot be considered a valid ratification of that act. The Plaintiffs argue, however, that evidence existed from which the requisite knowledge could have been *imputed* to Lloyd's, from either of two potential sources. First, evidence suggested that Bigbee, his supervisor Starbuck, and Max Acton knew prior to Lloyd's correspondence that the Clarks had been disturbed by the guards' behavior and that their dog had been shot. Second, a memo had been placed in Acton Inc.'s files midway through the surveillance period which noted that Robert Clark "had been raising ____ with the guards last night" and had complained to the police about the guards' conduct. Because this information

was possessed only by Lloyd's agents, and there was no evidence that Lloyd's accessed this information before sending the two letters at issue, we reject the Clarks' contention that Lloyd's itself should be deemed knowledgeable of these facts for ratification purposes.

The only evidence of Lloyd's prior knowledge about the events at issue was its receipt of Acton Inc.'s letter of January 31, so that letter defines the scope of any possible ratification. Because the letter did not mention the material facts about the shooting of the Clarks' dog, and because the Plaintiffs had to prove Lloyd's responsibility for both the surveillance and the dog incident in order to support an intentional infliction of emotional distress claim, Lloyd's could not be held liable under the doctrine of ratification.

## CONCLUSION

For the reasons stated above, we REVERSE the district court's denial of the Rule 50(b) renewed motion for judgment as a matter of law by Thomas William Brien, representative of Underwriters at Lloyd's London. We instruct the district court to VACATE the jury verdicts and damage awards for each of the Plaintiffs on their intentional infliction of emotional distress claim and enter judgment in favor of the Defendant.