549 A.2d 950

Pearlena MOSES, Appellant,

v.

Daniel T. McWILLIAMS, Esq., Marvin Krane, M.D., and
Albert Einstein Medical Center.

Pearlena MOSES, Appellant,

v.

UNDERWRITERS ADJUSTING COMPANY.

Superior Court of Pennsylvania.

Argued Sept. 16, 1987.

Filed Sept. 28, 1988.

William Marvin, Philadelphia, for appellant.

H. Robert Fiebach, Philadelphia, for McWilliams, appellee.

Howard M. Cyr, III, Philadelphia, for Krane, appellee.

S. David Fineman, Philadelphia, for Albert Einstein Medical Center, appellee.

Before CIRILLO, President Judge, and BROSKY, OLSZEWSKI, DEL SOLE, MONTEMURO, TAMILIA, KELLY, POPOVICH and JOHNSON, JJ.

154

MONTEMURO, Judge:

This is a consolidated appeal from four orders issued by the Philadelphia County Court of Common Pleas dismissing the complaints of appellant Pearlena Moses in two separate actions in trespass, one against appellee Underwriters' Adjusting Company (Underwriters), the other against appellees Albert Einstein Medical Center (Albert Einstein), Dr. Marvin Krane, and Daniel T. McWilliams, Esq.[1] Both cases arose from a medical malpractice action filed by appellant following a hysterectomy she underwent in the summer of 1977.

In July of 1977, appellant was admitted to the emergency room at Albert Einstein. There, an intern diagnosed her as suffering from pelvic inflammatory disease. She was released with instructions to take a prescription for antibiotics. Her condition worsened, necessitating her admission to another hospital where she came under the care of appellee Dr. Marvin Krane. On July 7, 1977, he performed a total hysterectomy on her and continued to treat her until he released her to the care of her private physician in November 1977. Appellant then brought suit against Albert Einstein Medical Center, alleging that the care she received there had been negligent and had necessitated the hysterectomy.

In the consolidated actions now before us, appellant alleges[2] that, in the malpractice action, Albert Einstein hired Underwriters to manage its defense of the case. Underwriters, in turn, retained appellee Daniel T. McWilliams to represent Albert Einstein. Underwriters wrote to Dr. Krane and asked that he contact its representatives to discuss appellant's medical condition. Neither appellant nor her attorney were notified of this request. Dr. Krane

1. This consolidated appeal was originally heard by a three-judge panel of this Court. That panel determined that because the case involved issues both of first impression and of great societal importance, it should be certified for en banc review.

2. Because we here review an order granting a motion for judgment on the pleadings, we accept as true all of appellant's well-pleaded averments of fact. *See Capanna v. Travelers Insurance Co.,* 355 Pa.Super. 219, 513 A.2d 397 (1986).

complied with the request and, in conversations with both an Underwriters employee and with McWilliams, revealed information that he had gained in the course of his treatment of appellant.

Appellant claims that she first became aware of Dr. Krane's involvement in the case when her attorney was notified by Mr. McWilliams that he intended to call Dr. Krane as an expert witness at trial. Appellant's counsel informed Dr. Krane at that time that his communications with Mr. McWilliams were unauthorized and should cease immediately. Despite this injunction, Dr. Krane continued to meet with defense counsel, allowed McWilliams to review and copy portions of appellant's patient file, and testified at trial as a fact witness.[3]

Appellant contends that as her treating physician Dr. Krane had a duty to refrain both from taking any actions which would be adverse to her interests in the malpractice litigation and from making any disclosures to other parties of information gained in the course of his treatment of her, unless authorized to do so either by her or by law. She also alleges that Dr. Krane had knowledge of or should have known of the provisions of the Interprofessional Code, the American Medical Association Principles of Medical Ethics, and the Hippocratic Oath, all of which provide for the maintenance of confidentiality between physician and patient. Appellant argues that because Dr. Krane ignored these provisions, and breached the confidence gained in treating her, he should be liable in tort for breach of the physician/patient privilege. She further asserts that Albert Einstein, McWilliams and Underwriters should be liable for inducing that breach. Accordingly, our initial inquiry on appeal, a question of first impression, is whether a treating physician's unauthorized and judicially unsupervised communications with his patient's adversary in a medical malpractice action are actionable as a breach of physician/patient confidentiality. Appellant argues, first, that a general

3. The Honorable Stanley M. Greenberg of the Philadelphia Court of Common Pleas ruled that Dr. Krane could not testify as an expert witness, but might do so as a fact witness.

cause of action for breach of the physician/patient confidentiality should exist; second, that a physician's judicially unsupervised and unauthorized communications with a patient's adversaries in litigation should give rise to that cause of action; and, third, that in such a context the defense of absolute privilege should not be available to the physician.[4] Appellant's last two questions presented concern her claim for defamation and are intertwined with the physician/patient confidentiality theory. She argues that the trial court erred in granting summary judgment before depositions were concluded, and also that the appellees should not be accorded the absolute privilege defense where the patient's confidentiality rights have been breached. We affirm the trial court's orders.

■ We first consider appellant's claim for breach of confidentiality and do so in light of the standard applicable

---

**4.** We need not concern ourselves with appellant's first argument that a general cause of action for breach of the physician/patient confidentiality should exist. The issue, as framed, is too broad. We need only to focus on the narrow factual context of this case. We note, however, that a majority of jurisdictions that have considered the broad issue of whether to recognize a general cause of action for a physician's breach of confidentiality have allowed such a claim. However, our research has revealed no court from any jurisdiction that has allowed recovery against a physician for breach of confidentiality under facts similar to those alleged in this case. *See, e.g., Hague v. Williams,* 37 N.J. 328, 181 A.2d 345 (1962); *Fedell v. Wierzbieniec, M.D.,* 127 Misc.2d 124, 485 N.Y.S.2d 460 (1985). When the cause of action has been recognized, it is in cases where there have been *extra-judicial* disclosures of confidential information or in cases, such as those involving custody, where the plaintiff's physical condition has not been in issue. *See, e.g., Horne v. Patton,* 291 Ala. 701, 287 So.2d 824 (1974) (physician disclosed confidential information to plaintiff's employer); *MacDonald v. Clinger, M.D.,* 84 A.D.2d 482, 446 N.Y.S.2d 801 (1982) (psychiatrist revealed confidential information to plaintiff's wife); *Doe v. Roe,* 93 Misc.2d 201, 400 N.Y.S.2d 668 (1977) (psychiatrist, without plaintiff's consent, published a book containing verbatim accounts of plaintiff's feelings); *Schaffer v. Spicer,* 88 S.D. 36, 215 N.W.2d 134 (1974) (in a custody case, psychiatrist gave to the attorney of the patient's ex-husband an affidavit containing information with regard to his patient's mental health, which was deemed inadmissible at hearing); *Berry v. Moench,* 8 Utah 2d 191, 331 P.2d 814 (1958) (doctor revealed information about plaintiff to another doctor for the purpose of conveying the information to the parents of a woman contemplating marriage to plaintiff).

for review of a judgment on the pleadings:[5] We accept as true all well-pleaded averments of fact and will uphold the trial court's decision only "in cases which are so free from doubt that trial would clearly be a fruitless exercise." *Capanna v. Travelers Insurance Co.*, 355 Pa.Super. 219, 226, 513 A.2d 397, 401 (1986). We find that within the narrow factual context of this case, appellant has failed to state a cause of action for breach of confidentiality. To find otherwise would undermine several well-established principles of this Commonwealth. We must keep in mind that when Dr. Krane made his disclosures, appellant had voluntarily instituted a medical malpractice action against Albert Einstein and had thereby placed in issue her medical condition. Given a patient's qualified right to privacy in his or her medical records and an individual's reduced expectation of privacy as a result of filing a civil suit for personal injuries in conjunction with policies supporting both the physician/patient privilege statute[6] and the absolute immunity from civil liability granted to witnesses in judicial proceedings, we will not recognize the cause of action for breach of confidentiality *as pled in this case.*[7]

Appellant argues that a physician's duty to maintain confidentiality outside of formal court proceedings is based upon the fiduciary nature of the physician-patient relation-

**5.** As to the claim for breach of confidentiality against Dr. Krane, the trial court granted a judgment on the pleadings, not summary judgment. *See* Trial Court Opinion at 3, 5.

**6.** 42 Pa.C.S. § 5929.

**7.** Our tort law has evolved such that every alleged wrong or injury does not have a legal remedy. *Cf.* W. Prosser and W. Keeton, *The Law of Torts* § 1 (5th ed. 1984) ("[t]here are many interferences with the plaintiff's interests, including negligently causing mere mental suffering without physical consequences ..., for which the law will give no remedy ..."). Before we grant relief to a plaintiff, we must reflect upon the principles and policies of this Commonwealth that will be affected by creating a new cause of action. We do not find that this case warrants establishing a new cause of action. If Dr. Krane has behaved unethically, the medical profession can discipline him as would the legal profession reprimand a lawyer who had violated the Code of Professional Responsibility. *See, e.g., Coralluzzo v. Fass,* 450 So.2d 858 (Fla.1984) ("whether [a doctor] has violated the ethical standards of his profession is a matter to be addressed by the profession itself").

ship, the constitutional right of privacy, and the ethical principles of the medical profession.

We first note that a patient's right to confidentiality is less than absolute. In order for a disclosure to be actionable at law, the disclosure must be made without legal justification or excuse. The law is replete with statutory justifications for disclosure that are deemed to outweigh the patient's right to confidentiality. For example, a physician has a duty to report otherwise confidential information relating to wounds or injuries inflicted by deadly weapons (18 Pa.C.S.S. § 5106), contagion (53 Pa.S.A. § 24663), child abuse (11 Pa.S.A. § 2204), and medical history in cases of adoption (23 Pa.C.S.A. § 2909). While the existence of reporting requirements is not controlling on the issue before us, it indicates the appropriateness of balancing the competing interests at stake when we evaluate the scope of the physician-patient privilege and the physician's duty of non-disclosure.

In *In Re June 1979 Allegheny County Investigating Grand Jury*, 490 Pa. 143, 415 A.2d 73 (1980), then Chief Justice Eagen, writing for a three-judge plurality, concluded that "[d]isclosure of confidences made by a patient to a physician, or even of medical data concerning the individual patient could, under certain circumstances, pose such a serious threat to a patient's right not to have personal matters revealed that it would be impermissible under either the United States Constitution or the Pennsylvania Constitution." *Id.*, 490 Pa. at 149–153, 415 A.2d at 77–78. However, as evidenced by the plurality's decision not to protect from discovery the particular medical records in that case,[8] the constitutional right to privacy concerning

8. In *In Re June 1979 Allegheny County Investigating Grand Jury*, 490 Pa. 143, 415 A.2d 73 (1980), a subpoena was issued for certain tissue sample reports as part of an investigation involving the use and misuse of county facilities, funds, employees, and equipment. The reports would allow the grand jury to determine the names of the patients whose tissue had been submitted for testing. The supreme court concluded that the patients' physician-patient privilege and right to privacy were not offended by the subpoena.

medical information is qualified. In that case, the court acknowledged that there would be "a limited invasion of privacy" but considered it "justified under the circumstances." *Id.*, 490 Pa. at 152 n. 11, 415 A.2d at 78 n. 11. *See also Denoncourt v. Commonwealth State Ethics Commission,* 504 Pa. 191, 470 A.2d 945 (1983) (the constitutional right of privacy is not absolute).

■ Additionally, in tort law we recognize a right to privacy that is not constitutionally based. In *Forster v. Manchester,* 410 Pa. 192, 189 A.2d 147 (1963), our supreme court defined the right as an *"interest in not having [one's] affairs known to others." Id.,* 410 Pa. at 194–98, 189 A.2d at 149–50. The invasion of privacy is actionable when there is an unreasonable and serious interference with one's privacy interest.[9] Nonetheless, an individual's right to privacy is clearly qualified when that individual has filed suit for personal injuries. *Forster, supra.* In *Forster,* a plaintiff who was suing for personal injuries allegedly sustained in an automobile accident, was placed under surveillance by a private detective hired by defendant's insurance carrier. The purpose of the investigation was to record plaintiff's daily activities to ascertain the freedom of movement of her limbs. Because she felt the surveillance was invasive, plaintiff instituted suit against the detective for invasion of privacy and intentional infliction of emotional distress. Our supreme court found reasonable the manner in which the investigation was conducted and denied recovery on the invasion of privacy claim. The Court stated that

[i]n determining the extent of the interest to be protected, we must take cognizance of the fact that appellant has made a claim for personal injuries.... It is not uncommon for defendants in accident cases to employ investigators to check on the validity of claims against them. *Thus, by making a claim for personal injuries*

9. An invasion of privacy occurs when there is an "interference with the interest of the individual in leading, to some reasonable extent, a secluded and private life, free from the prying eyes, ears and publications of others." Restatement (Second) of Torts § 652A comment b (1977).

*appellant must expect reasonable inquiry and investi-
gation to be made of her claim and to that extent her
interest in privacy is circumscribed.*

*Id.*, 410 Pa. at 196–97, 189 A.2d at 150 (footnote omitted)
(emphasis added). *See also Glenn v. Kerlin*, 248 So.2d 834,
836 (La.App.1971) (although that jurisdiction recognizes a
right to privacy and makes the invasion of that right
actionable, once plaintiff has filed a suit for personal inju-
ries and then attempts to recover in tort for allegedly
wrongful disclosures by his doctor, plaintiff "no longer may
claim the sanctity of his privacy"). In *Forster*, the supreme
court concluded that that there is "much social utility to be
gained" from investigation of claims because "[i]t is in the
best interests of society that valid claims be ascertained and
fabricated claims be exposed." 410 Pa. at 197, 189 A.2d at
150. The words of the supreme court in *Forster* are
equally applicable to the case at bar. When Dr. Krane
made his disclosures, appellant had already commenced a
medical malpractice action wherein she alleged personal
injuries. With the filing of suit, appellant's privacy expec-
tations were reduced to the extent that she could anticipate
that her claims would be investigated. It is in society's best
interest that malpractice claims be investigated at the earli-
est possible stage to determine their validity.

Similarly, the Pennsylvania physician-patient privi-
lege statute reflects the concept that there is a reduction in
a patient's privacy interest and right to confidentiality when
he or she files suit for personal injuries. The statute
provides that:

[n]o physician shall be allowed, in any civil matter, to
disclose any information which he acquired in attending
the patient in a professional capacity, which shall tend to
blacken the character of the patient, without consent of
said patient, *except in civil matters brought by such
patient, for damages on account of personal injuries.*

42 Pa.C.S. § 5929 (emphasis added). By enacting this stat-
ute, our legislature has weighed competing policies to deter-
mine at what point the physician-patient privilege is lost or

surrendered and has concluded that this loss or surrender occurs when a party institutes a civil action "on account of personal injuries." Appellant contends, however, that the statute sets forth the parameters of the *testimonial* privilege and that the exception does not apply outside of formal court proceedings. It was enacted, she argues, to balance a patient's right to privacy against the "unquestioned need for evidence *in court.*" Brief of Appellant at 27 (emphasis added).

The statute should not be interpreted so narrowly that it encompasses only situations involving formal court proceedings. According to the canons of construction used in this Commonwealth, words in a statute are to be accorded their plain meaning. *Commonwealth v. Stanley,* 498 Pa. 326, 446 A.2d 583 (1982); 1 Pa.C.S. § 1903(a). Nothing in the physician-patient privilege statute evinces a legislative intent that the exception for "civil matters brought by the patient" should apply only to disclosures made in a court-supervised setting. Patients waive the privilege when they institute civil actions for personal injuries. The statute applies to disclosures without reference to the stage in the proceedings at which they are made. The statute extends the privilege to the patient, not to the physician. *Romanowicz v. Romanowicz,* 213 Pa.Super. 382, 248 A.2d 238 (1968). By filing actions for personal injuries, the plaintiff-patients waive their privilege and, in effect, implicitly consent to disclosures by their physicians concerning matters relating to the plaintiff-patients' medical conditions.

Moreover, contrary to appellant's assertions, ethical considerations and the Commonwealth's medical licensing statutes do not provide a clear-cut source for recognizing a cause of action for breach under the facts as alleged in this case. The Hippocratic Oath does not serve as an absolute bar to disclosures: "Whatever in connection with my professional practice, or not in connection with it, I may see or hear in the lives of men *which ought not to be spoken abroad* I will not divulge...." Similarly, the 1980 statement by the American Medical Association concerning a

doctor's release of confidential information is broad, provides little guidance, and does not in any event, prohibit Dr. Krane's actions: "A physician shall respect the right of patients, of colleagues, and of other health professionals, and shall safeguard patient confidences *within the constraints of the law.*" Principle IV of the Medical Ethics of the American Medical Association (in effect at the time of Dr. Krane's disclosures). One of our central concerns in this case is to determine what "ought not to be spoken abroad" by a treating physician in the context of a medical malpractice action and what are "the constraints of the law." *See generally* Gellman, *Prescribing Privacy: The Uncertain Role of the Physician in the Protection of Patient Privacy*, 62 N.C.L.Rev. 255 (1984). Even the Current Opinions of the Judicial Council of the AMA do not absolutely bar disclosures of confidences. In fact, Section 5.07 states that "[a] physician should respect the patient's *expectations of confidentiality* concerning medical records that involve the patient's care and treatment." As we have already noted, an individual's expectations of confidentiality are diminished when that individual files a civil action for personal injuries. To allow recovery at law for conduct such as Dr. Krane's that occurred within the context of a judicial action voluntarily instituted by appellant would ignore the fact that appellant's privacy interest was diminished by her commencement of the malpractice suit.

■ Finally, Pennsylvania's medical licensing statute, 63 P.S. § 422.41, does not provide appellant with a basis for a cause of action. The statute proscribes "unprofessional conduct." [10] The only sanctions that can be imposed upon a physician for unprofessional conduct are refusal, revocation or suspension by the board of the doctor's license. There is no provision for an independent cause of action against the doctor for money damages, nor is there any indication that the General Assembly intended to create one.

**10.** Unprofessional conduct is defined to include that which is a "departure from or failing to conform to an ethical or quality standard of the profession." 63 P.S. § 422.41(8).

■ The policy of granting immunity from civil liability in the context of judicial proceedings also compels a finding that appellant has failed to state a cause of action under the facts as alleged in this case. Dr. Krane's statements were absolutely privileged from civil liability because they were made *"in the regular course of judicial proceedings* and ... [were] *pertinent and material"* to the litigation. *See Post v. Mendel,* 510 Pa. 213, 220, 507 A.2d 351, 355 (1986) (quoting *Kemper v. Fort,* 219 Pa. 85, 93, 67 A. 991, 994–95 (1907)). *See also Hoover v. Van Stone,* 540 F.Supp. 1118, 1121 (D.Del.1982) ("[s]trict legal relevance need not be demonstrated; instead the allegedly defamatory statements must have only some connection to the subject matter of the pending action"). In the case at bar, there is no allegation that Dr. Krane's statements were not relevant or not pertinent to the litigation. Furthermore, "communications *pertinent to any stage of judicial proceedings are accorded an absolute privilege." Pelagatti v. Cohen,* 370 Pa.Super. 422, 436, 536 A.2d 1337, 1344 (1988) (emphasis added). *See also* Restatement (Second) of Torts § 588 comment b (1977) (the privilege protects a witness "while engaged in private conferences with an attorney at law with reference to proposed litigation").

The United States Supreme Court, discussing the reasons supporting this policy of immunity, has stated:

The immunity of parties and witnesses from subsequent damages liability for their testimony in judicial proceedings was well established in English common law. ... In the words of one 19th–century court, in damages suits against witnesses, "the claims of the individual must yield to the dictates of public policy, which requires that the paths which lead to ascertainment of truth should be left as free and unobstructed as possible." A witness' apprehension of subsequent damages liability might induce two forms of censorship. First, witnesses might be reluctant to come forward to testify. And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability.

*Briscoe v. Lahue,* 460 U.S. 325, 330–333, 103 S.Ct. 1108, 1112–1114, 75 L.Ed.2d 96 (1983) (footnotes and citations omitted). *See also Collins v. Walden,* 613 F.Supp. 1306, 1314 (N.D.Ga.1985), *aff'd without opinion,* 784 F.2d 402 (11th Cir.1986) (the purpose of witness immunity is to ensure that the judicial process functions "unimpeded by fear on the part of its participants that they will be sued for damages for their part in the proceedings").

While it is true that immunity from civil liability in judicial proceedings has been applied most frequently in defamation actions, many courts, including those in Pennsylvania, have extended the immunity from civil liability to other alleged torts when they occur in connection with judicial proceedings. *See, e.g., Brown v. The Delaware Valley Transplant Program,* 372 Pa.Super. 629, 539 A.2d 1372 (1988) (mutilation of a corpse, civil conspiracy, and assault and battery); *Pelagatti v. Cohen, supra* (interference with contractual relationship); *Thompson v. Sikov,* 340 Pa.Super. 382, 490 A.2d 472 (1985) (intentional infliction of emotional distress); *Passon v. Spritzer,* 277 Pa.Super. 498, 419 A.2d 1258 (1980) (malicious use and abuse of process and invasion of privacy); *Triester v. 191 Tenants Association,* 272 Pa.Super. 271, 415 A.2d 698 (1979) (disparagement of title). *See also Blanchette v. Cataldo,* 734 F.2d 869 (1st Cir.1984) (interference with contractual relationship); *Blake v. Levy,* 191 Conn. 257, 464 A.2d 52 (1983) (same); *Middlesex Concrete Products and Excavating Corp. v. Carteret Industrial Association,* 68 N.J.Super. 85, 172 A.2d 22 (1961) (same). Such an extension of immunity evinces the strong policy behind the privilege: to leave reasonably unobstructed the paths which lead to the ascertainment of truth, *Briscoe, supra,* and to encourage witnesses with knowledge of facts relevant to judicial proceedings to give "complete and unintimidated testimony," *Binder v. Triangle Publications, Inc.,* 442 Pa. 319, 324, 275 A.2d 53, 56 (1971). Recognizing a cause of action for breach of confidentiality in the factual context of the case at bar will undermine this policy. As one court observed:

[i]f the policy, which in defamation actions affords an absolute privilege or immunity to statements made in judicial and quasi-judicial proceedings is really to mean anything then we must not permit its circumvention by affording an almost equally unrestricted action under a different label.

*Hoover v. Van Stone*, 540 F.Supp. 1118, 1124 (D.Del.1982) (quoting *Rainier's Dairies v. Raritan Valley Farms*, 19 N.J. 552, 117 A.2d 889, 895 (1955)) (case involving claims of defamation, tortious interference with contractual relationships, abuse of process and barratry)). The court in *Hoover* also stated that:

[the counts of tortious interference with contractual relationships, abuse of process, and barratry] are all predicated on the very same acts providing the basis for the defamation claim. Application of the absolute privilege solely to the defamation count ... would be an empty gesture indeed, if, because of artful pleading, the plaintiff could still be forced to defend itself against the same conduct regarded as defamatory. *Maintenance of these kindred causes of action, moreover, would equally restrain the ability of judges, parties, counsel and witnesses to speak and write freely during the course of judicial proceedings.*

*Id.* (emphasis added).

■ Appellant argues that the cases where the absolute privilege has been extended beyond the defamation claim can be distinguished from the case at bar. She argues that "plaintiffs in those cases had no basis to complain of the fact that the communication was made ...[;] their grievance went solely to the *content* of the communication." Brief of Appellant at 61. However, appellant's claim is based upon the content of Dr. Krane's communications, not just the fact of communication. Appellant has lodged a claim against Dr. Krane because he disclosed information pertaining to her medical condition, not merely because he

spoke with Mr. McWilliams and the insurance representative.[11]

■ Moreover, witness immunity should and does extend to pre-trial communications. The policy of providing for reasonably unobstructed access to the relevant facts is no less compelling at the pre-trial stage of judicial proceedings. As one federal district court has stated in a case involving claims of negligence, fraudulent and innocent misrepresentation, defamation and intentional infliction of emotional distress brought by a defendant-doctor in a malpractice action against another doctor who had prepared advisory medical reports for a plaintiff in anticipation of a malpractice action:

> The overriding concern for disclosure of pertinent and instructive expert opinions before and during medical malpractice actions is no less significant than the clearly recognized need for all relevant factual evidence during the course of litigation.... Physicians who wish to limit groundless malpractice suits obviously would support review of potential malpractice claims by fellow members of the medical profession. If doctors who provide expert reports are subjected to civil liability for the contents of their reports, fewer doctors will be willing to evaluate

11. It might be argued that while we should extend this blanket immunity to lay witnesses, a doctor should not be protected because of the unique relationship between doctor and patient; doctors should have a duty greater than lay witnesses to protect confidences that are revealed to them by virtue of their professional roles. We dismiss that argument as the United States Supreme Court dismissed a similar argument in *Briscoe v. Lahue, supra.* In that case, where police officers were being sued under 42 U.S.C. § 1983 which allows convicted persons to assert damage claims against police officers who gave perjured testimony at their trials, the Court noted that the immunity analysis rests on "functional categories," not on the status of the witness. 460 U.S. at 342, 103 S.Ct. at 1119. The judicial process depends on the functions of its various "players," and immunity is granted in order to facilitate the judicial process. A doctor-witness who is testifying as a fact witness performs the same function as any other witness: to present evidence through testimony to aid the tribunal in its truth-finding function. The functioning of the tribunal is seriously handicapped if witnesses, whether they be doctors or lay persons, fear liability from statements made by them that have some relation to the litigation.

potential malpractice claims in advance of litigation. Rather, medical experts will only provide sworn expert testimony in medical malpractice cases that are in progress because witness immunity will protect those, and only those, statements. In the absence of expert review, then, meritless medical malpractice suits will be eradicated less frequently prior to filing. This result is neither desirable nor efficient.

*Kahn v. Burman,* 673 F.Supp. 210, 213 (E.D.Mich.1987) (citations omitted). The same principles apply to the case at bar. By granting immunity from liability to the doctor-potential witness for disclosures made that are relevant to the malpractice claim, the "paths which lead to ascertainment of truth" are left reasonably unobstructed, *Briscoe, supra,* 460 U.S. at 333, 103 S.Ct. at 1114. Meritless medical malpractice claims can be disposed of at the earliest possible stage of litigation by allowing free access to material and relevant facts once a claimant has filed suit. Because the plaintiff's expectations of privacy have been reduced with the instigation of litigation, there is no breach of confidentiality. We therefore recognize the absolute privilege as a bar to the claim for breach of confidentiality against Dr. Krane.

We note, as have other courts, that *ex parte* interviews are less costly [12] and easier to schedule than depositions, are conducive to candor and spontaneity, are a cost-efficient method of eliminating non-essential witnesses in a case where a plaintiff might have a number of treating physi-

---

**12.** *Cf. Lazorick v. Brown,* 195 N.J.Super. 444, 480 A.2d 223 (1984). In that case, the New Jersey Superior Court held that plaintiff-patient could not prevent his adversaries in litigation from speaking privately with his current treating physicians about any unprivileged matter. The court stated that

the provision for admission at trial of videotaped depositions of a treating physician or expert witness, reflects the need to use less costly and time consuming means of producing evidence. It is not only costly to all parties to litigation but it may be impractical and inefficient to produce all treating doctors for depositions without knowing in advance whether their testimony will be useful or helpful in resolving disputed issues.

*Id.* at 454–55, 480 A.2d at 229.

cians, and allow both parties to confer with the treating physicians. *See, e.g., Doe v. Eli Lilly & Co.,* 99 F.R.D. 126, 128 (D.D.C.1983); *State of Missouri, ex rel. Stufflebam, M.D. v. Appelquist,* 694 S.W.2d 882, 888 (Mo.App.1985). Moreover, as the district court in *Eli Lilly* pointed out, although the purpose of the physician-patient privilege is to promote open communication, "the privilege was never intended ... to be used as a trial tactic by which a party entitled to invoke it may control to his advantage the timing and circumstances of the relevant information *he must inevitably see revealed at some time."* 99 F.R.D. at 128 (emphasis added).[13] Further, the argument for preventing full disclosure of patient confidences rests upon a policy that seeks to promote the health of the citizen. Informed diagnoses are to some extent impossible without complete candor by the patient concerning his life and habits. To encourage that candor, a cloak of confidentiality is placed upon communications by a patient to his doctor. Nevertheless, lifting that cloak when a patient puts his or her physical condition in issue by filing suit does not make it more likely that patients will cease communicating with their doctors when they seek treatment for illnesses. It is in a patient's best interest to be candid with his or her

---

**13.** Professor Wigmore states an analogous concern:

> The injury to justice by the repression of the facts of corporal injury and disease is much greater than any injury which might be done by disclosure. And furthermore, the few topics—such as venereal disease and abortion—upon which secrecy might be seriously desired by the patient come into litigation ordinarily in such issues (as when they constitute cause for a bill of divorce or a charge of crime) that for these very facts common sense and common justice demand that the desire for secrecy shall not be listened to....
>
> The real support for the privilege seems to be mainly the weight of professional medical opinion pressing upon the legislature. And that opinion is founded on a natural repugnance to being the means of disclosure of personal confidence. But the medical profession should reflect that the principal issues in which justice asks for such disclosure are those—personal injury and life and accident insurance—which the patient himself has *voluntarily brought into court.* Hence, the physician has no reason to reproach himself with the consequences which justice requires.

8 Wigmore, Evidence § 2380(a) (McNaughton rev. 1961).

doctor in order to obtain the most informed treatment possible.

Allowing *ex parte* interviews with treating physicians does not open the door to any and every disclosure by a doctor concerning a plaintiff's medical condition. Rather, disclosure should be limited to that which is pertinent and material to the underlying litigation. If disclosures are neither pertinent nor material, they will be inadmissible at trial. Moreover, by issuing protective orders, a court can place restrictions on the scope of medical discovery without actually prohibiting *ex parte* interviews. For example, in the malpractice litigation underlying the instant action, the trial court issued an order to the effect that Dr. Krane could testify on Albert Einstein Medical Center's behalf only as a fact witness, and not as an expert. *See also State of Missouri, ex rel. Stufflebam v. Appelquist, supra.*

 Although a doctor who grants a private interview in connection with judicial proceedings would enjoy the judicial privilege protecting him from liability for defamation, he could lose that privilege by disclosing information that has no relation to the underlying action. Similarly, if a doctor makes statements clearly unrelated to a lawsuit, there might be a cause of action stated against him for breach of confidentiality. We, however, need not make such a finding here because that issue is not before us. *See State of Missouri, ex rel. Stufflebam v. Appelquist,* 694 S.W.2d at 889 (Hogan, P.J. concurring, noted that although a court might authorize *ex parte* interviews with a doctor, "the physician who grants the interview is still 'on his own' ... in determining whether the scope of the questions ... is so extensive as to require him to expose himself to liability ..., [and] that a decision to grant an interview is not without risk, and must be strictly voluntary").

██ Because we find that appellant has not stated a cause of action for breach of confidentiality under the facts of the instant case, her claims for inducement of that breach must necessarily fail. Accordingly, we affirm the

trial court's orders dismissing appellant's claims for breach of confidentiality and inducement to breach.

■ We now turn to appellant's second group of questions involving the claim for defamation and find that the absolute privilege which protects statements made in a judicial context precludes appellant's defamation claim. *See Pelagatti, supra,* 370 Pa.Super. at 438, 536 A.2d at 1345; *Post v. Mendel, supra,* 510 Pa. at 220, 507 A.2d at 355. Our discussion concerning the application of the absolute privilege to bar appellant's breach of confidentiality claim is equally applicable to the defamation claim.

■ Appellant also argues that the grant of summary judgment was premature in this case because she was unable to depose McWilliams concerning a conversation that he had had with Dr. Krane after the conclusion of the trial in her medical malpractice action. Because McWilliams claimed the work product privilege during trial, both parties agreed to defer his deposition until after the disposition of the malpractice suit. We find that, again, conversations between Dr. Krane and McWilliams are covered by the absolute privilege accorded relevant statements made in the course of litigation. The litigation in the medical malpractice suit was not concluded, post-trial motions were still to be decided, and the law suit with which we are concerned was still pending.

■ We also note that appellant failed to allege which statements made during the conversation were defamatory. Although she had not yet deposed McWilliams before filing her complaint, she had deposed Dr. Krane. A complaint for defamation must, on its face, identify specifically what allegedly defamatory statements were made, and to whom they were made. Failure to do so will subject the complaint to dismissal for lack of publication. *See Gross v. United Engineers and Constructors, Inc.,* 224 Pa.Super. 233, 235, 302 A.2d 370, 372 (1973); *see also Raneri v. DePolo,* 65 Pa.Commw. 183, 186, 441 A.2d 1373, 1375 (1982). Further, the trial court found that all the defamatory statements

that were alleged with specificity were made to privileged persons. Appellant did allege in her complaint that defamatory remarks were made to "other persons"; ostensibly, these were non-privileged communications. She has failed, however, to make to this Court, or to the trial court, any argument that these other persons actually could have existed. She only claims that failure to permit her to have access to McWilliams' records prevented her from obtaining corroborating information.

We find that it would be unreasonable to draw the inference from the few facts with which appellant has presented us that defamatory statements were made in a non-privileged context. We hold therefore that the trial court did not abuse its discretion in dismissing her claim for defamation.

The orders of the trial court are affirmed.

CIRILLO, President Judge, files a concurring and dissenting Opinion in which OLSZEWSKI and TAMILIA, JJ., join.

DEL SOLE, J., files a concurring statement.

CIRILLO, President Judge, concurring and dissenting:

Because I disagree with the majority's resolution of the issues involved in this case, I respectfully dissent in part and concur in part. I agree with the majority's disposition of the defamation claim before us. I believe, however, that some cause of action should exist in this Commonwealth for a physician's breach of the duty of confidentiality to a patient. Because the majority finds that Moses is precluded from stating a claim for breach by her underlying medical malpractice action, it fails to reach this issue. I would hold that such a cause of action exists, and that Moses has alleged sufficient facts to make out a claim for breach.

In July of 1977, Pearlena Moses was admitted to the emergency room of Albert Einstein Medical Center, an appellee in this case. Moses was diagnosed by an intern as suffering from pelvic inflammatory disease, and treated for

that condition. Moses' symptoms worsened, and she was referred by her family doctor to appellee Dr. Marvin Krane, who specialized in gynecology and obstetrics. Dr. Krane performed a total abdominal hysterectomy on Moses, removing both ovaries, the uterus, and the fallopian tubes. Dr. Krane continued to treat and monitor Moses after the surgery; she was released into the care of her family physician in November of 1977. Moses then brought suit against Albert Einstein, alleging that the negligent care she had received there necessitated the total hysterectomy.

In her complaints, Moses alleged, *inter alia,* that because her treating physician, Dr. Krane, had agreed to help defense counsel in preparing the case for Albert Einstein Medical Center, he breached the duty of confidentiality owed to her as his patient. Moses also alleged that information given by Krane to the effect that she suffered from venereal disease, specifically gonorrhea, rather than pelvic inflammatory disease, was defamatory. Appellees Dr. Krane, Underwriters' Adjusting Company, Albert Einstein Medical Center, and Daniel T. McWilliams moved for summary judgment and for judgment on the pleadings. Those motions were granted by the trial court, and a consolidated appeal followed. After consideration of that appeal, a panel of this court determined that because this case involves issues of first impression in this Commonwealth, and of great societal and legal import, it should be certified for en banc review.

Moses' allegations on appeal raise two issues before this court. Her first three arguments deal with the establishment of a cause of action in tort for a physician's breach of his confidential relationship with his patient. Moses argues, first, that such a cause of action should exist; secondly, that a physician's judicially unsupervised and unauthorized communications should give rise to that cause of action; and lastly, that in such a context the defense of absolute privilege should not be available to that physician. Moses' last two arguments concern her claim for defamation and are intertwined with the physician/patient con-

fidentiality theory. She argues that the trial court erred in granting summary judgment before depositions were concluded, and also that the appellees should not be accorded the absolute privilege defense where the patient's confidentiality rights have been breached.

The majority refuses to create a new cause of action in this Commonwealth for a physician's breach of confidentiality in a physician/patient relationship. Instead, it confines itself to what it terms "the narrow factual context of this case." I am of the opinion that the policies and principles of this Commonwealth require the recognition of a cause of action for breach of the physician/patient relationship. Further, I strongly disagree with the majority's conclusion that the filing of the underlying tort action which placed the patient's condition in issue is sufficient to permit the ex parte disclosure of information revealed by the patient to his or her doctor as a result of that confidential relationship.

The issue of whether or not a patient should be accorded a cause of action for a physician's breach of confidentiality is a case of first impression in this Commonwealth. The majority of jurisdictions that have considered this issue have allowed the claim. Only one jurisdiction has held that the cause of action should not be available. In *Quarles v. Sutherland*, 215 Tenn. 651, 389 S.W.2d 249 (1965), the Tennessee Supreme Court refused to alter the common law rule existing in that state which held that neither a patient nor a physician had a privilege to refuse to disclose in court or to a third person a communication of one to the other. *Id.* at 655, 389 S.W.2d at 251. After examining the statutes of that state, the court held that it could find nothing which would allow a cause of action in the face of the common law rule. It stated that that state's licensing statutes and statutes defining ethical conduct were merely administrative provisions. *Id.* at 656, 389 S.W.2d at 251–52. It held further that statutes concerning evidentiary privileges were just that, and did not bolster appellant's argument that a cause of action should exist. According to the court, "the

petitioner is trying to base a cause of action upon a rule of evidence." *Id.* at 657, 389 S.W.2d at 252.

After considering the case law from other jurisdictions, I would conclude that the better reasoned approach is to allow such a cause of action. I do not think that a claimant's argument in such a case would be based upon a rule of evidence. It is rather based upon a relationship that has for centuries been accorded the highest degree of sanctity by the profession itself, as well as by society as a whole. In determining whether this relationship should give rise to a cause of action, I would follow the lead of the District of Columbia court in *Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d 580 (D.C.App.1985), and examine Pennsylvania's licensing statutes, evidentiary rules and privileged communications statutes, common law principles of trust, and the Hippocratic Oath and principles of medical ethics. *Vassiliades*, 492 A.2d at 590. Moses had cited all these possible sources of public policy in her complaint.

The physician/patient relationship was first articulated in the Fifth Century, B.C. in the Hippocratic Oath of the medical profession. It states in pertinent part that:

> Whatever in connection with my professional practice or not in connection with it I see or hear in the life of men which ought not to be spoken abroad I will not divulge as recommending that all such should be kept secret.

As the Oath demonstrates, for over two thousand years, physicians have recognized a duty to protect the confidences of their patients, and society has tacitly relied upon that principle.

The AMA's Principles of Medical Ethics, adopted in 1977, show the continuing vitality of this obligation. The principles provide that "[a] physician shall respect the rights of patients, of colleagues, and of other health professionals, and shall safeguard patient confidences within the constraints of the law."

Further, the Current Opinions of the Judicial Council of the AMA also reflects these values. Section 5.05 of the Opinions states:

The information disclosed to a physician during the course of the relationship between physician and patient is confidential to the greatest possible degree.... The physician should not reveal confidential communications or information without the express consent of the patient, unless required to do so by law.

Section 5.07 states:

Both the protection of confidentiality and the appropriate release of information in records is the rightful expectation of the patient. A physician should respect the patient's expectations of confidentiality concerning medical records that involve the patient's care and treatment.

These ethical directives illustrate the manner in which the medical profession views the divulgence of confidences made to a physician by his patient.

These considerations, however, are not merely ethical objectives to which the medical community aspires. Public policy [1] mirrors these considerations in licensing regulations and testimonial privilege statutes. State legislation codifies the result of society's balance of policies promoting full disclosure of patient confidences in a judicial setting, and protecting the patient's interest in complete non-disclosure. *See, e.g., Mull v. String,* 448 So.2d 952, 955 (Ala.1984). The narrow exceptions which seem to typify this type of legisla-

1. Although public policy is a somewhat elusive concept, the Ohio Supreme Court defined it succinctly in *Pittsburgh, Cincinnati, Chicago and St. Louis R.R. Co. v. Kinney,* 95 Ohio St. 64, 115 N.E. 505 (1916):

In substance, it may be said to be the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare and the like. It is that general and well settled public opinion relating to man's plain, palpable duty to his fellowmen, having due regard to all the circumstances of each particular relation and situation.

Sometimes such public policy is declared by Constitution; sometimes by statute; sometimes by judicial decision. More often, however, it abides only in the customs and conventions of the people—in their clear consciousness and conviction of what is naturally and inherently just and right between man and man.

Public policy is the cornerstone—the foundation—of all Constitutions, statutes, and judicial decisions; and its latitude and longitude, its height and its depth, greater than any or all of them.

*Id.* at 68, 115 N.E. at 507.

tion illustrate the great weight attached to non-disclosure. *See, e.g., Hope v. Landau,* 21 Mass.App. 240, 241, 486 N.E.2d 89, 91 (1985). Testimonial privilege statutes as well as statutes concerning licensing of physicians have played a significant role in the acceptance by most states of the breach of confidentiality cause of action. *See Horne v. Patton,* 291 Ala. 701, 706, 287 So.2d 824, 827 (1973) (those states which had enacted a physician/patient testimonial privilege statute were almost uniform in allowing the cause of action for breach of confidentiality, those which had not enacted such a statute were split on that issue); *see also Vassiliades, supra; Geisberger v. Willuhn,* 72 Ill.App.3d 435, 436, 28 Ill.Dec. 586, 588, 390 N.E.2d 945, 947 (1979); *Alberts v. Devine,* 395 Mass. 59, 65–66, 479 N.E.2d 113, 119 (1985); *MacDonald v. Clinger,* 84 A.D.2d 482, 484, 446 N.Y.S.2d 801, 803 (1982); *Piller v. Kovarsky,* 194 N.J.Super. 392, 396, 476 A.2d 1279, 1281 (1984); *Humphers v. First National Bank,* 298 Or. 706, 718–719, 696 P.2d 527, 535 (1985). *Accord Hammonds v. Aetna Casualty & Surety Co.,* 243 F.Supp. 793, 797 (N.D.Ohio E.D.1965) (applying Ohio law).

Pennsylvania has a testimonial privilege statute which promotes the confidentiality of patient/physician communications. 42 Pa.C.S. § 5929 states:

**§ 5929. Physicians not to disclose information**

No physician shall be allowed, in any civil matter, to disclose any information which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity, which shall tend to blacken the character of the patient, without consent of said patient, except in civil matters brought by such patient for damages on account of personal injuries.

42 Pa.C.S. § 5929. The Commonwealth has also promulgated licensing statutes to provide its citizens with the best possible medical care. To this end, disciplinary or corrective measures may be imposed by the licensing board upon a physician if he or she is "guilty of immoral or unprofessional conduct. Unprofessional conduct shall include depar-

ture from or failing to conform to an ethical or quality standard of the profession.... The ethical standards of a profession are those ethical tenets which are embraced by the professional community in this Commonwealth." 63 P.S. § 422.41(8) & (8)(i).

In Pennsylvania, therefore, ethical considerations are not merely aspirational, they present a duty to practicing physicians, although no legal liability attaches statutorily as a result of the breach of that duty. We are then faced with the question of whether disciplinary sanctions such as suspension of a license are sufficient to protect the policies involved here. The majority indicates that disciplinary action should be adequate and appropriate. I disagree. Consideration of those policies indicates that more is needed than administrative sanctions, because more than health is involved.

It is true that the argument for preventing full disclosure of patient confidences centers on the health of the individual:

> Any time a doctor undertakes the treatment of a patient, and the consensual relationship of physician and patient is established, two jural obligations (of significance here) are simultaneously assumed by the doctor. Doctor and patient enter into a simple contract, the patient hoping that he will be cured, and the doctor optimistically assuming that he will be compensated. As an implied condition of that contract ..., the doctor warrants that any confidential information gained through the relationship will not be released without the patient's permission.

*Hammonds*, 243 F.Supp. at 801. This promise may be justifiably relied upon by the patient. "Almost every member of the public is aware of the promise of discretion contained in the Hippocratic Oath, and every person has a right to rely upon this warranty of silence." *Id.* A patient lays bare the sanctum sanctorum of his physical and psychological self to his physician in his belief in the integrity of this promise. In many cases, he has no choice if he wishes to be healed. If the physician then breaks his vow,

and divulges these confidences, he outrages the very foundation of society's concept of the physician as healer.

While it is obvious that effective medical treatment is essential to the health and well-being of both society and its members, the concern for confidentiality in the relationship goes beyond these considerations:

> When a patient seeks out a doctor and retains him, he must admit him to the most private part of the material domain of man. Nothing material is more important or more intimate to man than the health of his mind and body. Since the layman is unfamiliar with the road to recovery, he cannot sift the circumstances of his life and habits to determine what is information pertinent to his health. As a consequence, he must disclose all information in his consultations with his doctor—even that which is embarrassing, disgraceful or incriminating. To promote full disclosure, the medical profession extends the promise of secrecy.... The candor which this promise elicits is necessary to the effective pursuit of health; there can be no reticence, no reservation, no reluctance when patients discuss their problems with their doctors. But the disclosure is certainly intended to be private.

*Hammonds,* 243 F.Supp. at 801–802. *See also Alberts,* 395 Mass. at 69, 479 N.E.2d at 118; *Hague v. Williams,* 37 N.J. 328, 335–36, 181 A.2d 345, 349 (1962); *Berry v. Moench,* 8 Utah 2d 191, 196, 331 P.2d 814, 817 (1958). Society is concerned not merely with the health of the community, but with the dignity and privacy of its members. That dignity and privacy are violated where the fiduciary relationship between a patient and physician—a relationship built on the highest expectation of trust—is betrayed.

This court has already expressed its concern over the "total" care of the patient and our disapproval of any interference with the relationship between physician and patient. In *Alexander v. Knight,* 197 Pa.Super. 79, 177 A.2d 142 (1962), the plaintiff wife had suffered whiplash in a car accident. During litigation, her doctor released information without her consent to the doctor hired by defendant

to interview him. We adopted the trial court's opinion in that case. Even though that court did not find that incident necessary to the disposition of the case, it was nonetheless disturbed by the actions of both doctors:

> We are of the opinion that members of a profession, especially the medical profession, stand in a confidential or fiduciary capacity as to their patients. They owe their patients more than just medical care for which payment is exacted; there is a duty of total care; that includes and comprehends a duty to aid the patient in litigation, to render reports when necessary, and to attend court when needed. That further includes a duty to refuse affirmative assistance to the patient's antagonist in litigation. The doctor, of course, owes a duty to his conscience to speak the truth; he need, however, speak only at the proper time.... [I]nducing ... [the] breach of ... a confidential relationship [between a doctor and patient] is to be and is condemned.

*Knight,* 177 A.2d at 146 [2]. In this Commonwealth, then, public policy, or as the Ohio Supreme Court has defined it, the "clear consciousness and conviction of what is naturally and inherently just and right between man and man," *Pittsburgh, Cincinnati, Chicago and St. Louis R.R. Co. v. Kinney,* 95 Ohio St. 64, 68, 115 N.E. 505, 507 (1916), envisions that the physician owes a duty of a fiduciary, of trust and faith to his patient, and, in justice, the patient should reasonably be able to rely upon that duty.

I would find, therefore, that there must be a legal remedy allowed the patient in such a case in order to emphasize the importance of the physician/patient relationship and to protect the dignity of the relationship as well as the health of the patient. Public policy in this Commonwealth and society's obvious valuation of the relationship in question demands this result.

**2.** In *Knight,* we adopted the trial court's opinion. That opinion is not reported at 197 Pa.Super. 79, 177 A.2d 142, however. It may be found at 25 Pa.D. & C.2d 649.

The next consideration must be to define the parameters of this cause of action so that they are inclusive enough to serve these purposes. Initially, I would note that I agree with those jurisdictions that have found that this claim is brought in tort, rather than in contract law. Relegating a plaintiff to a cause of action in contract would severely limit the damages which could be recovered. *MacDonald*, 84 A.D.2d at 486, 446 N.Y.S.2d at 804. Further, we have already recognized the importance of the fiduciary aspect of the physician/patient relationship in *Alexander v. Knight, supra.* Although that relationship is partially founded in a contract between patient and physician from which evolves a fiduciary duty and an expectation of confidentiality, I am in agreement with the courts of Massachusetts and New York which have stated: "We believe that the relationship contemplates an additional duty springing from but extraneous to the contract, and that the breach of such duty is actionable as a tort." *MacDonald*, 84 A.D.2d at 486, 446 N.Y.S.2d at 804; *see also Alberts*, 395 Mass. at 69, 479 N.E.2d at 120 (contractual relationship gives rise to a duty of confidentiality).

As a cause of action in tort, the plaintiff must then establish the four elements of a prima facie case—a duty, breach of that duty, causation, and damages. The duty arises out of the existence of the relationship between patient and physician. Moses has alleged the existence of that duty; she states in her complaint that Dr. Krane was her treating physician, and that those statutes and ethical considerations that we have discussed created a duty of confidentiality which should not have been violated. What we are concerned with here is not plaintiff's ability to show that a duty exists, but with defendant's justification for the breach. Those jurisdictions that have accepted the cause of action for breach of confidentiality have noted that the duty is not absolute, since the statutory testamentary privilege is not absolute. Where disclosure of information is important for the safety of the individual or is in the public interest, then the doctor may reveal those confidences without liability. *See Humphers*, 298 Or. at 720, 696 P.2d at 535; *see*

*also Horne,* 291 Ala. at 709, 287 So.2d at 830; *Alberts,* 395 Mass. at 75, 479 N.E.2d at 124; *MacDonald,* 84 A.D.2d at 487, 446 N.Y.S.2d at 805; *Berry,* 8 Utah 2d at 196, 331 P.2d at 817; *accord Hammonds,* 243 F.Supp. at 801.

Further, as with the testimonial privilege, where the patient is shown to have consented to the disclosure, the physician may not be held liable for making it. *See, e.g., Petrillo v. Syntex Laboratories, Inc.,* 148 Ill.App.3d 581, 590, 102 Ill.Dec. 172, 177, 499 N.E.2d 952, 957 (1986) *cert. denied sub nom. Tobin v. Petrillo,* —— U.S. ——, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987); *Alberts,* 395 Mass. at 75, 479 N.E.2d at 124; *Landau,* 21 Mass.App. at 241, 486 N.E.2d at 90; *Hague,* 37 N.J. at 336, 181 A.2d at 349; *Anker v. Brodnitz,* 98 Misc.2d 148, 150, 413 N.Y.S.2d 582, 585 (1979) *aff'd mem.,* 73 A.D.2d 589, 422 N.Y.S.2d 887 (1979). That consent may be expressly given, as in a writing. Here the issue revolves around the question of implied consent.

Most states have held that when a patient files a law suit in which her medical condition is placed in issue, she has impliedly consented to the disclosure of information which had been confidential. She has waived her privilege which prevents her doctor from testifying. *See* 42 Pa.C.S. § 5929; *Dennie v. University of Pittsburgh School of Medicine,* 638 F.Supp. 1005, 1008 (W.D.Pa.1986) (applying Pennsylvania law); *see also Bond v. District Court,* 682 P.2d 33, 38 (Colo.1984) (en banc); *Wenninger v. Muesing,* 307 Minn. 405, 407, 240 N.W.2d 333, 335 (1976); *Jaap v. District Court,* 623 P.2d 1389, 1391 (Mont.1981); *Nelson v. Lewis,* 130 N.H. 106, 109, 534 A.2d 720, 722 (1987). The rationale behind this policy is that it is inconsistent for a patient litigant to base a claim upon his medical condition and then use the privilege to prevent the opposing party from obtaining and presenting conflicting evidence pertaining to that condition. *Bond,* 682 P.2d at 38.

The same considerations apply in a situation where a patient is attempting to bring a suit against her physician for breach of the duty of confidentiality. In a sense, this is similar to a medical malpractice action where the physician

being sued must be allowed to testify about the patient's condition in order to put his version of the facts before the jury. *Panko v. Consolidated Mutual Insurance Co.,* 423 F.2d 41, 44 (3rd Cir.1970) (applying Pennsylvania law). Other courts have handled these situations in similar manners. The majority of jurisdictions have held that a patient waives his right to a physician's full confidentiality when he puts his medical condition into issue in a law suit:

> [An] ... exception[ ] [to the physician's duty of confidentiality] arises where ... the physical condition of the patient is made an element of a claim ... [even when] that claim has not yet been pressed to litigation.... [T]he same policy which during litigation permits, even demands disclosure of information acquired during the course of the physician-patient relationship allows the disclosure thereof to the person against whom the claim is being made, when recovery is sought prior to or without suit. At this point the public interest in an honest and just result assumes dominance over the individual's right of nondisclosure.

*Hague,* 37 N.J. at 336, 181 A.2d at 349. *See also Mull v. String,* 448 So.2d 952, 954 (Ala.1984); *Fedell v. Wierzbieniec,* 127 Misc.2d 124, 126, 485 N.Y.S.2d 460, 462 (Sup.1985); *accord Hammonds,* 243 F.Supp. at 800. Once a patient puts his condition into issue, he is recognizing that his dignity and privacy are no longer of paramount importance. The balance of concerns is settled on the side of disclosure. We are then faced with the question of how to resolve the balance when, although the patient has placed his medical condition into issue, his physician, without his knowledge or actual consent, enters into an ex parte interview with the defendant's attorney.

I am persuaded by the reasoning of those jurisdictions which forbid such interviews because to sanction such interviews would be to vitiate the physician/patient privilege. While the testimonial privilege may be waived to a limited extent by the patient litigant's placing her medical condition

in issue, to say that the relationship is "waived" means nothing:

> "Waiver" does not authorize a private conference between a doctor and a defense lawyer. It is one thing to say that a doctor may be examined and cross-examined by the defense in a courtroom, in conformity with the rules of evidence, with the vigilant surveillance of plaintiff's counsel, and the careful scrutiny of the trial judge; it is quite another matter to permit, as alleged here, an unsupervised conversation between the doctor and and his patient's protagonist.... [T]he mere waiver of a testimonial privilege does not release the doctor from his duty of secrecy and from his duty of loyalty in litigation and no one may be permitted to induce the breach of these duties.

*Hammonds,* 243 F.Supp. at 805. To approach the analysis from the perspective of "waiver" does not resolve the problem of how to balance competing interests here.

Some jurisdictions when faced with this question in an action for personal injuries or medical malpractice suits have held that ex parte interviews are proper. *See Arctic Motor Freight, Inc. v. Stover,* 571 P.2d 1006 (Alaska 1977); *Coralluzzo v. Fass,* 450 So.2d 858 (Fla.1984); *State ex rel. Stufflebam v. Appelquist,* 694 S.W.2d 882 (Mo.App.1985); *Lazorick v. Brown,* 195 N.J. Super. 444, 480 A.2d 223 (1984). *Accord Doe v. Eli Lilly & Co., Inc.,* 99 F.R.D. 126 (D.D.C.1983). There are several rationales behind this rule. Several of these jurisdictions have found that no statutory or common law prohibition against ex parte interviews exists, and so have refused to prohibit them in these situations. *Coralluzzo,* 450 So.2d at 859. Other courts have pointed out that no party has a proprietary right to evidence. *Appelquist,* 694 S.W.2d at 888; *accord Eli Lilly & Co.,* 99 F.R.D. at 128. For the most part, however, jurisdictions which permit ex parte interviews have focused on time and cost restraints. They base their holdings on the misconception that ex parte interviews are less costly and time consuming than the alternative method, that is, formal

discovery. *Trans–World Investments v. Drobny,* 554 P.2d 1148, 1152 (Alaska 1976); *Lazorick,* 195 N.J. Super. at 454–455, 480 A.2d at 229; *accord Eli Lilly & Co.,* 99 F.R.D. at 128.

In *State ex rel. Stufflebam v. Appelquist, supra,* a Missouri court prohibited a judge from denying a motion to compel the plaintiff in a medical malpractice action to authorize the defendant's interview with one of his treating doctors. That court, quoting extensively from *Doe v. Eli Lilly & Co., supra,* found that ex parte interviews were less costly than depositions and easier to schedule. It also found that such interviews were more conducive to spontaneity and candor, and therefore more desirable. According to the Missouri court, an ex parte interview was a cost-efficient way in which to eliminate unnecessary witnesses. *Appelquist,* 694 S.W.2d at 888. *See also Lazorick,* 195 N.J.Super. at 455, 480 A.2d at 229; *accord Eli Lilly & Co.,* 99 F.R.D. at 128.

In *Lazorick v. Brown, supra,* the New Jersey Superior Court held that the plaintiff in a medical malpractice case should be required to sign a waiver allowing the defendant to discuss her condition with treating physicians citing the excessive cost of formal discovery. That court pointed out that the discovery rules were not the only methods by which discovery could be conducted. Further, the court refused to assume that defense counsel would take advantage of the absence of plaintiff's counsel at such an interview to elicit privileged information. *Lazorick,* 195 N.J.Super. at 455–56, 480 A.2d at 229. The court stated that even though it might be considered unjust for a doctor to "go over to another camp," that doctor should be allowed to serve justice as he saw it, or, as in this case, to help another doctor. *Id.* "The justice system should [not be made to] pay this price so that the doctor-patient relationship will not be bruised." *Id.* at 456, 480 A.2d at 230.

In *Doe v. Eli Lilly & Co., supra,* the federal district court for the District of Columbia cited all these reasons in finding that a plaintiff was required to authorize the inter-

view between her treating physician and defense counsel. It went on to express concern over the possibility that the testimonial privilege, if extended to ex parte interviews, could become a trial tactic, allowing plaintiff's counsel to monitor the progress of the defense:

> The privilege was never intended ... to be used as a trial tactic by which a party entitled to invoke it may control to his advantage the timing and circumstances of the release of information he must inevitably see revealed at some time.

*Eli Lilly & Co.*, 99 F.R.D. at 128.

The majority indicates that it, too, is concerned with time and costs. I, however, agree with those courts that have forbidden ex parte interviews of treating physicians by adverse parties, regardless of costs, on the basis that they are violative of public policy. *See Mull*, 448 So.2d at 955; *Petrillo*, 148 Ill.App.3d at 593, 102 Ill.Dec. at 177, 499 N.E.2d at 957; *Wenninger*, 307 Minn. at 410–11, 240 N.W.2d at 337; *Jaap*, 623 P.2d at 1392; *Nelson*, 130 N.H. at 111, 534 A.2d at 723; *Smith v. Ashby*, 106 N.M. 358, 360, 743 P.2d 114, 116 (1987); *Stoller v. Moo Young Jun*, 118 A.D.2d 637, 637, 499 N.Y.S.2d 790, 791 (1986); *Anker*, 98 Misc. 2d at 152–153, 413 N.Y.S.2d at 584; *Loudon v. Mhyre*, 110 Wash.2d 675, 677, 756 P.2d 138, 140 (1988); *accord Manion v. N.P.W. Medical Center*, 676 F.Supp. 585, 594–95 (M.D.Pa.1987). I am aware that most of these cases involve evidentiary concerns rather than theories of liability in tort, but I would find their reasoning instructive and applicable to the present situation. The presence of plaintiff's counsel at an interview between the plaintiff's physician and defense counsel prevents the inadvertent disclosure of irrelevant information which may overstep the boundaries of the privilege and lead to the discovery of embarrassing and harmful information. *Roosevelt Hotel Limited Partnership v. Sweeney*, 394 N.W.2d 353, 357 (Iowa 1986). *Wenninger*, 307 Minn. at 411, 240 N.W.2d at 337; *Nelson*, 130 N.H. at 111, 534 A.2d at 723; *Anker*, 98 Misc.2d at 152–153,

413 N.Y.S.2d at 585; *Loudon,* 110 Wash.2d at 677, 756 P.2d at 140.

Further, I note, as did the Illinois court in *Petrillo v. Syntex Laboratories, Inc., supra,* which I would find most persuasive, that concern with excessive discovery time and costs is also misplaced. Depositions are not the only way in which a defendant can conduct discovery aside from the ex parte interview. As the *Petrillo* court noted, methods of formal discovery may just as easily serve the purpose. *Petrillo,* 148 Ill.App.3d at 596–97, 102 Ill.Dec. at 183, 499 N.E.2d at 963; *Ashby,* 106 N.M. at 360, 743 P.2d at 116; *Loudon,* 110 Wash.2d at 677, 756 P.2d at 140. I also am in disagreement with statements that refusal to allow ex parte interviews in some way presents a tactical advantage to the plaintiff. I do not believe that requiring compliance with formal discovery methods gives plaintiffs the ability to somehow uncover the defense's trial strategy, any more than it would in any other cause of action. As the Washington Supreme Court stated, "[T]he argument that depositions unfairly allow plaintiffs to determine defendants' trial strategy does not comport with a purpose behind the discovery rules—to prevent surprise at trial." *Loudon,* 110 Wash.2d at 680, 756 P.2d at 142.

In any case, I agree with both the Illinois and the Washington courts that the time consumed as well as the costs involved in formal discovery do not create such a hardship here as to require us to allow ex parte interviews. I fail to see how allowance of ex parte interviews would in any way lead to truth in the litigation process. I agree with the Illinois court that the doctor's opinion in an ex parte interview should not differ from that expressed at a deposition or in interrogatories. *Petrillo,* 148 Ill.App.3d at 597, 102 Ill.Dec. at 183, 499 N.E.2d at 963; *see also Ashby,* 106 N.M. at 360, 743 P.2d at 116. Allowing an ex parte interview in no way balances properly the concerns of both parties and of public policy. I find that such concerns are more appropriately met by requiring that formal discovery methods be followed.

Of course, counsel are free to agree to methods of discovery, if they so choose. I would note with approval the requirement of the Alaska Supreme Court in *Arctic Motor Freight* that "counsel ... confer in good faith concerning discovery ..., [that they] exchange information and comply with discovery requests 'in a manner demonstrating candor and common sense.'" *Arctic Motor Freight, Inc.,* 571 P.2d at 1009 (quoting *Trans–World Investments v. Drobny,* 554 P.2d at 1152). I am hard pressed to understand how that is to occur, however, in situations like the one presently before us, where neither the appellant nor her counsel was aware of the interview, and where the patient-litigant's physician rushes to the aid of defense counsel.

Further, I am convinced that ex parte interviews are improper because the rationales utilized by those jurisdictions allowing such interviews do not address the heart of the problem, that is, the violation of the fiduciary duty that a physician owes his patient. Any attempt to balance competing interests must take this into account.

> Private nonadversary interviews of a doctor by adverse counsel would offer no ... protection to the patient's right of privacy. The presence of the patient's counsel at the doctor's interrogation permits the patient to know what his testimony is, allays a patient's fears that his doctor may be disclosing personal confidences, and thus helps preserve the complete trust between doctor and patient which is essential to the successful treatment of the patient's condition.

*Wenninger,* 307 Minn. at 411, 240 N.W.2d at 337. *See also Ashby,* 106 N.M. at 360, 743 P.2d at 116; *Loudon,* 110 Wash.2d at 679, 756 P.2d at 141. Beyond allowing for the successful treatment of the patient, the ability to be present, in actuality or through counsel, preserves the trust of the patient in his or her chosen physician. It removes the concern for trespass to the patient's dignity and psyche, a concern which strikes at the heart of this fiduciary relationship.

The appellees, Dr. Krane, Albert Einstein, and Underwriters, all argue that these facts will not support Moses' claim for breach of confidentiality because any statements made in connection with litigation or pending litigation are absolutely privileged in a defamation context. *Binder v. Triangle Publications, Inc.*, 442 Pa. 319, 323, 275 A.2d 53, 56 (1971). Appellees argue that since the breach of confidentiality claim arises from the same set of facts which are asserted as giving rise to the defamation claim, the privilege should apply as a complete defense to that claim as well. They cite to us a series of cases from our own and other jurisdictions which they advance as having extended the concept of absolute privilege for statements arising in litigation to causes of action other than defamation, *see, e.g., Thompson v. Sikov*, 340 Pa.Super. 382, 490 A.2d 472 (1985) (statements did not give rise to cause of action for intentional infliction of emotional distress because privileged under § 46, comment g, of Restatement (Second) of Torts); *Passon v. Spritzer*, 277 Pa.Super. 498, 419 A.2d 1258 (1980) (absolute privilege applied to allegedly libellous statements contained in petition for writ of habeas corpus); *Triester v. 191 Tenants Association*, 272 Pa.Super. 271, 415 A.2d 698 (1979) (statements did not give rise to cause of action for disparagement of title because privileged under Restatement (Second) of Torts, § 635).

At first glance, it would seem that appellees have set out a plausible argument for expansion of the privileges connected with defamation to the present cause of action. A closer examination of the cases cited and of the Restatement (Second) of Torts, upon which they in some part rely, negates this impression, however. The Restatement (Second) of Torts outlines the absolute privileges available in actions for defamation in sections 583 to 592A. These sections are given wider application by sections 635 (making the privileges available in actions for injurious falsehood) and 652F (making the privileges available in actions for invasion of privacy), and apply to witnesses, jurors, parties to judicial proceedings, judges, legislators, administrative officers, husbands and wives, and attorneys at law. With

the exception of the section dealing with husbands and wives, these sections give to persons in the described roles a privilege to publish otherwise actionable material as some part of a judicial or legislative proceeding in which the person who asserts the privilege is involved. *See id.* §§ 585–592. This "privilege," which is actually in the nature of an immunity from suit, *see* 3 Restatement (Second) of Torts § 585, Introductory Note, has the effect of providing insulation from liability for statements which are related to a judicial or legislative proceeding, but would be actionable if made in another context. Nothing in the cases cited by appellees or in the Restatement sections outlining this immunity, however, addresses its applicability in situations where, due to a recognized and respected confidential relationship between the declarant and the individual who is the subject of the statements, the subject has a countervailing privilege which would prohibit the declarant from making statements violative of his duty to the subject, even in court. The attachment, whether by common law tradition or legislative enactment, of such a privilege to the confidential relationship recognizes a public policy favoring the relationship which outweighs even the policy to promote truth-finding in judicial and legislative proceedings.

Appellees would have us hold that the absolute immunity doctrine is widening. I do not think it has widened so far as to encompass this cause of action which I would espouse. Consider the most recent cases appellees cite to us from this court, *Pelagatti v. Cohen,* 370 Pa.Super. 422, 536 A.2d 1337 (1987) and *Brown v. Delaware Valley Transplant Program,* 372 Pa.Super. 629, 632, 539 A.2d 1372, 1374 (1988). While these cases do hold that the immunity insulates attorneys from liability for intentional torts against third parties based upon actions which were performed in a judicial context, they do not stand for the proposition that the immunity would apply if the tort alleged were based upon actions taken by the attorney *against* his own client. Thus appellees' arguments based on *Pelagatti* and *Brown* fail to convince us that the absolute immunity doctrine must swallow up any cause of action for breach of confidentiality

in a judicial setting. This is underlined by the Restatement section discussing the absolute liability for attorneys during a judicial proceeding. Comment a to section 586 states, "The privilege stated in this Section is based upon a public policy of securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice *for their clients.*" 3 Restatement (Second) Torts § 586 (1977) (emphasis added).

Further, an examination of these Restatement sections shows that public policy considerations behind the absolute privilege doctrine have, in most jurisdictions, been considered and discarded in favor of confidentiality in such situations. The doctrine of absolute privilege favors full disclosure on the part of witnesses or potential witnesses in a litigation setting:

> This privilege exists in favor of counsel so that he will be permitted to represent his client's interests to the fullest extent ... All persons involved in a judicial proceeding are encouraged by this privilege to speak frankly and argue freely without danger or concern that they may be required to defend their statements in a later defamation action.

*Smith v. Griffiths,* 327 Pa.Super. 418, 423, 476 A.2d 22, 25 (1984). This was the rationale behind the *Pelagatti* decision. *Pelagatti,* 370 Pa.Super. at 436, 536 A.2d at 1344. In contrast, as has already been discussed, the public policy of this Commonwealth has attempted to balance the competing concerns of the desirability in a litigation setting of full disclosure by a physician against the patient litigant's desire for no disclosure whatsoever. The existence of a statute which provides for limited disclosure in a litigation context is illustrative of finding that balance in favor of limiting disclosure. The balance therefore favors the rights of the patient litigant. *See, e.g., Vassiliades v. Garfinckel's, Brooks Bros.,* 492 A.2d 580, 591 (D.C.App.1985) (existence of licensing statute, which prevents disclosure except for situations involving gunshot wounds, and evidentiary code, which precludes testifying except in limited situations, found not applicable, illustrative of public policy encourag-

ing patient candor and physician confidentiality). Because we attach great weight to the fiduciary duty that the physician owes to his patient, we have found that a cause of action should exist where that confidence is breached, especially where the physician has engaged in ex parte conferences:

> At the very heart of every fiduciary relationship, including that between a patient and his physician, there exists an atmosphere of trust and faith in the discretion of the fiduciary. That being so, we find it difficult to believe that a physician can engage in an ex parte conference with the legal adversary of his patient without endangering the trust and faith invested in him by his patient.

*Petrillo,* 148 Ill.App.3d at 595, 102 Ill.Dec. at 182, 499 N.E.2d at 962. To hold that an absolute privilege should exist here would be to advance the importance of disclosure over trust and faith, and would eviscerate the very relationship we have set out to protect.

I must point out that refusing to apply the doctrine of absolute privilege in this instance in no way bruises the adversary system, a concern of the New Jersey court in *Lazorick v. Brown,* 195 N.J.Super. at 456, 480 A.2d at 231. In this Commonwealth, the balance achieved by the legislature will not be upset by any decision to join those jurisdictions which require formal discovery methods to be followed in situations where the physician/patient relationship is at risk. Obviously, a physician who has the consent of his patient would not be in danger of any suit here, *Baker v. Lafayette College,* 350 Pa.Super. 68, 72, 504 A.2d 247, 249 (1986); *see* 3 Restatement (Second) of Torts § 583 (1977) (consent is a defense to defamation claim), and during formal discovery, sanctioned by the court, the patient has clearly given his consent. Such measures balance considerations, because they allow disclosure in controlled situations, and in doing so, protect the relationship to which our courts and legislature have attached such importance.

Further, because I would find that the physician/patient relationship is so important to society, I would also hold that inducing the breach should give rise to a cause of

action in tort. *See, e.g., Alberts,* 395 Mass. at 69, 479 N.E.2d at 119; *accord Hammonds,* 243 F.Supp. at 803. Although I would not consider this to be a cause of action sounding strictly in contract, I note that tortious interference with contractual relations is also a basis for liability. *See Buczek v. First National Bank,* 366 Pa.Super. 551, 557, 531 A.2d 1122, 1124 (1987). I would find this to be analogous to a cause of action for inducing the breach of confidentiality. Again, the physician stands in a fiduciary relation to his patient. *See Alexander,* 177 A.2d at 146. The Restatement (Second) of Torts finds that such an inducement is the basis for liability.

Section 874 defines the violation of a fiduciary duty as follows:

§ 874. **Violation of Fiduciary Duty**

One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation.

4 Restatement (Second) of Torts, § 874 (ed. 1979). Comment c to that section states, "A person who knowingly assists a fiduciary in committing a breach of trust is himself guilty of tortious conduct, and is liable for the harm thereby caused." The comment then cites to Section 876 of the Restatement, which says, in turn:

§ 876. **Persons Acting in Concert**

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with another or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result, and his own conduct, separately considered, constitutes a breach of duty to the third person.

4 Restatement (Second) of Torts, § 876 (ed. 1979). We find subsection b to be controlling here.

Advice or encouragement to act acts as a moral support to a tortfeasor, and if the act encouraged is known to be tortious it has the same effect upon the liability of the advisor as participation or physical assistance. If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor, and is responsible for the consequences of the other's act. This is true when the act done is an intended trespass ... when it is merely a negligent act. The rule applies whether or not the other knows his act is tortious.... It likewise applies to a person who knowingly gives substantial aid to another who, as he knows, intends to do a tortious act.

*Id.* at comment d.

Considering Moses' allegations, then, in the light of this analysis, I would find that she has made out a cause of action for breach of confidentiality against Dr. Krane. Her complaint outlined licensing statutes and this Commonwealth's testamentary privilege statute, as well as the Hippocratic Oath, and ethical considerations of the AMA. She has alleged that Dr. Krane was her treating physician and had gathered information about her from their physician/patient relationship. She has further alleged that because of that relationship and because of these statutes and considerations, Dr. Krane had a duty to remain silent unless she gave her consent. She has alleged that Dr. Krane, without informing either counsel or herself, upon request by Underwriters, whom she alleges was hired by Albert Einstein to represent it in the underlying medical malpractice action, provided them with information and documents, even going so far as to testify for them in that trial. I would reiterate that this case is in its preliminary stages. I would hold that the trial court erred in dismissing Moses' complaint on preliminary objections.

The remaining claims for inducement of breach were dismissed by the trial court on a motion for summary judgment. It is axiomatic that summary judgment may be granted only where there is no genuine issue of material fact. The moving party will then be entitled to summary

judgment as a matter of law. Summary judgment should be granted, however, only in cases where the right to such judgment is clear and free from doubt. *Consumer Party of Pennsylvania v. Commonwealth,* 510 Pa. 158, 175, 507 A.2d 323, 331 (1986). Further, the reviewing court must take as true all well-pleaded facts in the non-moving party's pleadings, giving that party the benefit of all reasonable inferences to be drawn from those facts. *Curry v. Estate of Thompson,* 332 Pa.Super. 364, 368, 481 A.2d 658, 659 (1984).

Taking as true all well-pleaded facts in Moses' complaint, I would find that she has made out a cause of action against Albert Einstein, Underwriters, and McWilliams for inducement of breach as well. Again, she has alleged in her complaint that Albert Einstein hired Underwriters to represent it, and that Underwriters in turn hired McWilliams as counsel. She has also alleged that Underwriters, through an employee, contacted Dr. Krane, and that Underwriters arranged for McWilliams to speak with him. She alleged that all actions of the employees of Underwriters were done in the scope of their employment, and that McWilliams performed his duties with the consent, approval, knowledge and cooperation of Underwriters. She has further alleged that all three appellees initiated, promoted, requested, encouraged and gave financial support to the unauthorized communications of Dr. Krane.

The inference may be drawn from these facts that appellees intended to obtain from Dr. Krane information that he had obtained as a result of his fiduciary relationship with Moses. Further, because appellees knew that Dr. Krane was Moses' treating physician, one may draw the inference that they also knew that they were inducing a breach of a fiduciary duty by requesting and obtaining that information. I think that Moses has pled sufficient facts to raise the question of whether appellees were performing a tortious act in concert with Dr. Krane, or giving substantial assistance to him by asking for information protected by the physician/patient relationship while being aware that divulging that information was possibly tortious. These

questions are for the jury to determine. I do not find the case to be free of doubt, or the outcome to be prescribed by law. I would hold that the trial court erred in granting summary judgment on the facts that are before us.[3]

I would find, therefore, that the need of a patient's opponent in litigation to obtain all information relevant to the patient's physical condition does not necessarily weigh so heavily against the desire of a patient to keep confidential the information disclosed during the physician/patient relationship that we must allow ex parte interviews with the physician involved as a result. I would not assign litigation costs and time much value. I would add to the balance, however, the public policy of this Commonwealth which has always accorded great importance to the confidentiality of certain fiduciary relationships.[4] This addition, I am certain, would make the balance more even, if it did not, as it does to my mind, tip the scales to the side of the patient.

In any event, I am of the opinion that these competing interests can best be served, not by permitting unauthorized or nonconsensual disclosure of information, but, as I have stated, through utilization of the discovery process provided for by the Commonwealth's rules of court. The supervision and judgment of the trial court, allowing discovery of information and providing sanctions on misconduct, can best mitigate the effects of a desire for disclosure on the one hand, and confidentiality on the other. Cost is no basis for violating the confidentiality of the relationship involved here.

I would find that the public policy of this Commonwealth requires that a patient litigant be permitted to bring a claim against his physician for breach of confidentiality, and that ex parte discovery methods are forbidden in cases in which the physician/patient relationship is integral, and may give

3. We note also that Moses has alleged damages because of injury to her nerves and psyche, because of mental distress and embarrassment, shame, and humiliation.

4. I also note my concern over what effect the majority's decision will have on similar confidential relationships, for example, the attorney/client relationship, or the accountant/client relationship.

rise to a claim for that breach. I would therefore reverse the order of the trial court granting judgment on the pleadings and summary judgment for appellees on Moses' claims for breach of confidentiality and inducement of that breach, and remand for further proceedings in accordance with this opinion.

DEL SOLE, Judge, concurring:

I join the majority in all respects save one. I agree that when a patient files a lawsuit claiming personal injury, that patient has consented to the disclosure of relevant medical information by treating physicians. Therefore, there was no breach of the duty of confidentiality by Dr. Krane in this case. There being no breach of a duty, there can be no claim against the remaining defendants for inducing the disclosure. Also, I agree that judicial proceeding immunity would protect all of the defendants from claims for defamation.

I would not reach the issue of whether judicial proceeding immunity protects a person from liability for breaching a duty of confidentiality. It is not necessary to address that issue in this case. Also, since the claim in a breach of confidentiality case is based upon the fact something *was* disclosed, not what was disclosed, I seriously question whether immunity would be available in those situations.